# PORTLAND GOLF CLUB *v.* COMMISSIONER OF INTERNAL REVENUE

No. 89–530.   Argued April 17, 1990—Decided June 21, 1990

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined, and in which O'CONNOR, SCALIA, and KENNEDY, JJ., joined except as to Parts III–B and IV.  KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which O'CONNOR and SCALIA, JJ., joined, *post.* p. 171.

*Leonard J. Henzke, Jr.*, argued the cause for petitioner. With him on the briefs was *Allen B. Bush.*

*Clifford M. Sloan* argued the cause for respondent. On the brief were *Solicitor General Starr, Assistant Attorney General Peterson, Deputy Solicitor General Wallace, Alan I. Horowitz*, and *Robert S. Pomerance.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case requires us to determine the circumstances under which a social club, in calculating its liability for federal income tax, may offset losses incurred in selling food and drink to nonmembers against the income realized from its investments.

I

Petitioner Portland Golf Club is a nonprofit Oregon corporation, most of whose income is exempt from federal income tax under § 501(c)(7) of the Internal Revenue Code of 1954, 26 U. S. C. § 501(c)(7).[1] Since 1914 petitioner has owned and operated a private golf and country club with a golf course, restaurant and bar, swimming pool, and tennis courts. The great part of petitioner's income is derived from membership dues and other receipts from the club's members; that income is exempt from tax. Portland Golf also has two sources of nonexempt "unrelated business taxable income": sales of food and drink to nonmembers, and return on its investments.[2]

---

[1] Section 501(c)(7) grants an exemption from federal income tax to "[c]lubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder."

[2] Section 511 of the Code provides that the "unrelated business taxable income" of an exempt organization shall be taxed at the ordinary corporate rate. The term "unrelated business taxable income," as applied to the income of a club such as petitioner, is defined in § 512(a)(3)(A). That definition encompasses all sources of income except receipts from the club's members.

The present controversy centers on Portland Golf's federal income tax liability for its fiscal years ended September 30, 1980, and September 30, 1981, respectively. Petitioner received investment income in the form of interest in the amount of $11,752 for fiscal 1980 and in the amount of $21,414 for fiscal 1981. App. 18. It sustained net losses of $28,433 for fiscal 1980 and $69,608 for fiscal 1981 on sales of food and drink to nonmembers. Petitioner offset these losses against the earnings from its investments and therefore reported no unrelated business taxable income for the two tax years. In computing these losses, petitioner identified two different categories of expenses incurred in selling food and drink to nonmembers. First, petitioner incurred *variable* (or direct) expenses, such as the cost of food, which varied depending on the amount of food and beverages sold (and therefore would not have been incurred had no sales to nonmembers been made). For each year in question, petitioner's gross income from nonmember sales exceeded these variable costs.[3] Petitioner also included as an unrelated business expense a portion of the *fixed* (or indirect) overhead expenses of the club—expenses which would have been incurred whether or not petitioner had made sales to nonmembers. In determining what portions of its fixed expenses were attributable to nonmember sales, petitioner employed an allocation formula, described as the "gross-to-gross method," based on the ratio that nonmember sales bore to total sales.[4] When fixed

---

[3] For 1980, gross receipts from nonmember sales in the bar and dining room totaled $84,422, while variable expenses were $61,821. For 1981, gross receipts totaled $106,547, while variable expenses were $78,407. App. 85.

[4] For example, if 10% of petitioner's gross receipts were derived from nonmember sales, 10% of petitioner's fixed costs would be allocated to the nonexempt activity. That method of allocation appears rather generous to Portland Golf. The club charges nonmembers higher prices for food and drink than members are charged, even though nonmembers' meals presumably cost no more to prepare and serve. It therefore seems likely that the gross-to-gross method overstates the percentage of fixed costs prop-

expenses, so calculated, were added to petitioner's variable costs, the total exceeded Portland Golf's gross income from nonmember sales.[5]

On audit, the Commissioner took the position that petitioner could deduct expenses associated with nonmember sales up to the amount of receipts from the sales themselves, but that it could not use losses from those activities to offset its investment income. The Commissioner based that conclusion on the belief that a profit motive was required if losses from these activities were to be used to offset income from other sources, and that Portland Golf had failed to show that its sales to nonmembers were undertaken with an intent to profit.[6] The Commissioner therefore determined deficiencies of $1,828 for 1980 and $3,470 for 1981; these deficien-

---

erly attributable to nonmember sales. The parties, however, stipulated that this allocation method was reasonable. *Id.*, at 17.

[5] The following table shows petitioner's losses when fixed costs are allocated using the gross-to-gross method:

|  | 1980 | 1981 |
|---|---|---|
| Gross income | $84,422 | $106,547 |
| Variable expenses | (61,821) | (78,407) |
| Allocated fixed expenses | (51,034) | (97,748) |
| Net loss | ($28,433) | ($69,608) |

It is of interest to note that if petitioner's fixed costs had been allocated using an alternative formula, known as the "square foot and hours of actual use" method, see *id.*, at 29, its gross receipts exceeded the sum of variable and allocated fixed costs for both years:

|  | 1980 | 1981 |
|---|---|---|
| Gross income | $84,422 | $106,547 |
| Variable expenses | (61,821) | (78,407) |
| Allocated fixed expenses | (3,153) | (4,666) |
| Net profit | $19,448 | $23,474 |

[6] The general rule under the Code is that losses incurred in a profit-seeking venture may be deducted from unrelated income; expenses of a not-for-profit activity may be offset against the income from that activity, but losses may not be applied against income from other sources. See 1 B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts ¶¶ 20.1.2, 22.5.4, pp. 20–6, 22–63 to 22–64 (2d ed. 1989).

cies reflected tax owed on petitioner's investment income. App. 48–51.

Portland Golf sought redetermination in the Tax Court. That court ruled in petitioner's favor. 55 TCM 212 (1988), ¶ 88,076 P–H Memo TC. The court assumed, without deciding, that losses incurred in the course of sales to nonmembers could be used to offset other nonexempt income only if the sales were undertaken with an intent to profit. The court, however, held that Portland Golf had adequately demonstrated a profit motive, since its gross receipts from sales to nonmembers consistently exceeded the variable costs associated with those activities.[7] The court therefore held that "petitioner is entitled to offset its unrelated business taxable income from interest by its loss from its nonmember food and beverage sales computed by allocating a portion of its fixed expenses to the nonmember food and beverage sales activity in a manner which respondent agrees is acceptable." *Id.*, at 217, ¶ 88,076 P–H Memo TC, at 413.

The United States Court of Appeals for the Ninth Circuit remanded. App. to Pet. for Cert. 1a, judgt. order reported at 876 F. 2d 897 (1989). The Court of Appeals held that the Tax Court had applied an incorrect legal standard in determining that Portland Golf had demonstrated an intent to profit from sales to nonmembers. The appellate court relied on its decision in *North Ridge Country Club* v. *Commissioner*, 877 F. 2d 750 (1989), where it had ruled that a social club "can properly deduct losses from a non-member activity only if it undertakes that activity with the intent to profit, where profit means the production of gains in excess of all direct and indirect costs." *Id.*, at 756. The same court in the

---

[7] The Tax Court stated that Portland Golf "did intend to make a profit, and did make a profit between the amount received from sales to nonmembers and the costs related to those sales which would not have been incurred absent those sales." 55 TCM, at 216, ¶ 88,076 P–H Memo TC, at 416. The Tax Court, in articulating this standard for determining whether intent to profit had been shown, relied on its earlier reviewed decision in *North Ridge Country Club* v. *Commissioner*, 89 T. C. 563 (1987). That decision subsequently was reversed. 877 F. 2d 750 (CA9 1989).

present case concluded: "Because Portland Golf Club could have reported gains in excess of direct and indirect costs, but did not do so, relying on a method of allocation stipulated to be reasonable by the Commissioner, we REMAND this case to the tax court for a determination of whether Portland Golf Club engaged in its non-member activities with the intent required under *North Ridge* to deduct its losses from those activities." App. to Pet. for Cert. 2a–3a.[8]

Because of a perceived conflict with the decision of the Sixth Circuit in *Cleveland Athletic Club, Inc.* v. *United States*, 779 F. 2d 1160 (1985),[9] and because of the importance of the issue, we granted certiorari. 493 U. S. 1041 (1990).

## II

Virtually all tax-exempt business organizations are required to pay federal income tax on their "unrelated business taxable income." The law governing social clubs, however, is significantly different from that governing other tax-exempt entities. As to exempt organizations other than social clubs, the Code defines "unrelated business taxable income" as "the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of

---

[8] The basis for the Court of Appeals' remand order is not entirely clear to us. It appears, however, that the court left open the possibility that petitioner could establish its intent to profit by using some other method of allocating fixed costs (such as the "actual use" method, see n. 5, *supra*), while continuing to use the gross-to-gross formula in computing actual losses. Both parties interpret the Court of Appeals' decision in this manner, and both express disapproval of that approach. See Brief for Respondent 47, n. 25 ("[T]his argument is untenable"); Brief for Petitioner 48 ("While the Ninth Circuit's formula is better than that of the Government, it is basically unprincipled"). Our disposition of the case makes unnecessary precise interpretation of the Court of Appeals' opinion.

[9] See also *Brook, Inc.* v. *Commissioner*, 799 F. 2d 833 (CA2 1986); Rev. Rul. 81–69, 1981–1 Cum. Bull. 351–352; A. Scialabba, The Unrelated Business Taxable Income of Social Clubs, 10 Campbell L. Rev. 249 (1988).

such trade or business." 26 U. S. C. § 512(a)(1).[10] As to social clubs, however, "unrelated business taxable income" is defined as "the gross income (excluding any exempt function income), less the deductions allowed by this chapter which are directly connected with the production of the gross income (excluding exempt function income)." § 512(a)(3)(A).[11] The salient point is that § 512(a)(1) (which applies to most exempt organizations) limits "unrelated business taxable income" to income derived from a "trade or business," while § 512(a)(3)(A) (which applies to social clubs) contains no such limitation. Thus, a social club's investment income is subject to federal income tax, while the investment income of most other exempt organizations is not.

This distinction reflects the fact that a social club's exemption from federal income tax has a justification fundamentally different from that which underlies the grant of tax exemptions to other nonprofit entities. For most such organizations, exemption from federal income tax is intended to encourage the provision of services that are deemed socially beneficial. Taxes are levied on "unrelated business income" only in order to prevent tax-exempt organizations from gaining an unfair advantage over competing commercial enterprises.[12] See *United States* v. *American College of Physi-*

---

[10] Section 513(a) defines "unrelated trade or business" as "any trade or business the conduct of which is not substantially related . . . to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption."

[11] Section 512(a)(3)(B) defines "exempt function income" as "the gross income from dues, fees, charges, or similar amounts paid by members of the organization as consideration for providing such members or their dependents or guests goods, facilities, or services in furtherance of the purposes constituting the basis for the exemption of the organization to which such income is paid."

[12] See S. Rep. No. 2375, 81st Cong., 2d Sess., 28 (1950) ("The problem at which the tax on unrelated business income is directed is primarily that of unfair competition. The tax-free status of [these] organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes"); H. R. Rep.

*cians,* 475 U. S. 834, 838 (1986) ("Congress perceived a need to restrain the unfair competition fostered by the tax laws"). Since Congress concluded that investors reaping tax-exempt income from passive sources would not be in competition with commercial businesses, it excluded from tax the investment income realized by exempt organizations.[13]

The exemption for social clubs rests on a totally different premise. Social clubs are exempted from tax not as a means of conferring tax *advantages,* but as a means of ensuring that the members are not subject to tax *disadvantages* as a consequence of their decision to pool their resources for the purchase of social or recreational services. The Senate Report accompanying the Tax Reform Act of 1969, 83 Stat. 536, explained that that purpose does not justify a tax exemption for income derived from investments:

> "Since the tax exemption for social clubs and other groups is designed to allow individuals to join together to provide recreational or social facilities or other benefits on a mutual basis, without tax consequences, the tax exemption operates properly only when the sources of income of the organization are limited to receipts from the membership. Under such circumstances, the individual is in substantially the same position as if he had spent his income on pleasure or recreation (or other benefits) without the intervening separate organization. However, where the organization receives income from sources outside the membership, such as income from investments . . . upon which no tax is paid, the membership receives a benefit not contemplated by the exemption in that untaxed dollars can be used by the organization to provide pleasure or recreation (or other benefits) to its membership. . . . In such a case, the exemption is

No. 2319, 81st Cong., 2d Sess., 36 (1950). The tax on "unrelated business income" was added to the Code by the Revenue Act of 1950, ch. 994, 64 Stat. 906.

[13] See S. Rep. No. 2375, at 30–31; H. R. Rep. No. 2319, at 38.

no longer simply allowing individuals to join together for recreation or pleasure without tax consequences. Rather, it is bestowing a substantial additional advantage to the members of the club by allowing tax-free dollars to be used for their personal recreational or pleasure purposes. The extension of the exemption to such investment income is, therefore, a distortion of its purpose." S. Rep. No. 91–552, p. 71 (1969).

In the Tax Reform Act of 1969, Congress extended the tax on "unrelated business income" to social clubs. As to these organizations, however, Congress defined "unrelated business taxable income" to include income derived from investments. Our review of the present case must therefore be informed by two central facts. First, Congress intended that the investment income of social clubs should be subject to federal tax, and indeed Congress devised a definition of "unrelated business taxable income" with that purpose in mind. Second, the statutory scheme for the taxation of social clubs was intended to achieve tax *neutrality*, not to provide these clubs a tax advantage: Even the exemption for income derived from members' payments was designed to ensure that members are not disadvantaged as compared with persons who pursue recreation through private purchases rather than through the medium of an organization.

## III

Petitioner's principal argument is that it may deduct losses incurred through sales to nonmembers without demonstrating that these sales were motivated by an intent to profit. In the alternative, petitioner contends (and the Tax Court agreed) that if the Code does impose a profit-motive requirement, then that requirement has been satisfied in this case. We address these arguments in turn.

## A

We agree with the Commissioner and the Court of Appeals that petitioner may use losses incurred in sales to nonmem-

bers to offset investment income only if those sales were motivated by an intent to profit. The statute provides that, as to social clubs, "the term 'unrelated business taxable income' means the gross income (excluding any exempt function income), less the deductions *allowed by this chapter* which are directly connected with the production of the gross income (excluding exempt function income)." § 512(a)(3)(A) (emphasis added). As petitioner concedes, the italicized language limits deductions from unrelated business income to expenses allowable as deductions under Chapter 1 of the Code. See Brief for Petitioner 21–22. In our view, the deductions claimed in this case—expenses for food, payroll, and overhead in excess of gross receipts from nonmember sales—are allowable, if at all, only under § 162 of the Code. See *North Ridge Country Club* v. *Commissioner*, 877 F. 2d, at 753; *Brook, Inc.* v. *Commissioner*, 799 F. 2d 833, 838 (CA2 1986).[14] Section 162(a) provides a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Although the statute does not expressly require that a "trade or business" must be carried on with an intent to profit, this Court has ruled that a taxpayer's activities fall within the scope of § 162 only if an intent to profit has been shown. See *Commissioner* v. *Groetzinger*, 480 U. S. 23, 35 (1987) ("[T]o be engaged in a [§ 162] trade or business, . . . the taxpayer's primary purpose for engaging in the activity must be for income or profit"). Thus, the losses that Portland Golf incurred in selling food and drink to nonmembers will constitute "deductions allowed by this chapter" only if the club's nonmember sales were performed with an intent to profit.[15]

---

[14] Portland Golf appears to concede this point, too. See Brief for Petitioner 10 ("The parties agree that all of the expenses in issue . . . are the types of corporate expenses allowed as deductions by Code Section 162"). Petitioner does not identify any other Code provision which would serve as a basis for the deduction claimed in this case.

[15] Section 183 of the Code permits a taxpayer to offset expenses incurred in a not-for-profit activity against income from that activity up to the amount of the income. Even before the enactment of § 183, moreover, the

We see no basis for dispensing with the profit-motive requirement in the present case. Indeed, such an exemption would be in considerable tension with the statutory scheme devised by Congress to govern the taxation of social clubs. Congress intended that the investment income of social clubs (unlike the investment income of most other exempt organizations) should be subject to the same tax consequences as the investment income of any other taxpayer. To allow such an offset for social clubs would run counter to the principle of tax neutrality which underlies the statutory scheme.

Petitioner concedes that "[g]enerally a profit motive is a necessary factor in determining whether an activity is a trade or business." Brief for Petitioner 23. Petitioner contends, however, that by including receipts from sales to nonmembers within § 512(a)(3)(A)'s definition of "unrelated business taxable income," the Code has defined nonmember sales as a "trade or business," and has thereby obviated the need for an inquiry into the taxpayer's intent to profit. We disagree. In our view, Congress' use of the term "unrelated *business* taxable income" to describe all receipts other than payments from the members hardly manifests an intent to define as a "trade or business" activities otherwise outside the scope of § 162. Petitioner's reading would render superfluous the words "allowed by this chapter" in § 512(a)(3)(A): If each taxable activity of a social club is "deemed" to be a trade or business, then *all* of the expenses "directly connected" with those activities would presumably be deductible. Moreover, Portland Golf's interpretation ignores Congress' general intent to

courts and the Commissioner had not required that revenues earned in activities showing a net loss be declared as taxable income. See 1 Bittker & Lokken, n. 6, *supra*, ¶ 22.5.4, p. 22–63. Although § 183 is inapplicable to a nonprofit corporation such as Portland Golf, the Commissioner has followed longstanding tax principles in permitting the deduction of expenses incurred in nonmember sales up to the amount of petitioner's receipts. See Brief for Respondent 33. At issue in this case is petitioner's right to offset losses from nonmember sales against income from unrelated investments.

tax the income of social clubs according to the same principles applicable to other taxpayers. We therefore conclude that petitioner may offset losses incurred in sales to nonmembers against investment income only if its nonmember sales are motivated by an intent to profit.[16]

## B

Losses from Portland Golf's sales to nonmembers may be used to offset investment income only if those activities were undertaken with a profit motive—that is, an intent to generate receipts in excess of costs. The parties and the other courts in this case, however, have taken divergent positions as to the range of expenses that qualify as costs of the non-exempt activity and are to be considered in determining whether petitioner acted with the requisite profit motive. In the view of the Tax Court, petitioner's profit motive was established by the fact that the club's receipts from nonmem-

---

[16] The Code distinguishes a social club's "exempt function income" from its "unrelated business taxable income" by looking to the source of the payment: "[E]xempt function income" is limited to money received from the members. § 512(a)(3)(B). However, a social club could easily organize events whose primary purpose was to benefit the membership, yet arrange for nonmembers to make modest contributions toward the cost of the events. Those contributions would constitute "unrelated business taxable income"; but if losses incurred in such activities could be used to offset investment income, it would be relatively easy for clubs to avoid taxation on their investments.

The general rule that losses incurred in a not-for-profit activity may not be used to offset unrelated income rests on the recognition that one who incurs expenses without an intent to profit presumably derives some intrinsic pleasure or benefit from the activity. The Code's limitation on deductibility (expenses may be deducted up to, but not above, the gross income produced by the activity) reflects the view that taxpayers should not be allowed to deduct what are, in essence, personal expenses simply because the activity in question generates some receipts. Just as an individual taxpayer may not offset personal expenses against income from other sources, a social club should not be allowed to deduct expenses incurred for the benefit of the membership from unrelated business income.

ber sales exceeded its variable costs. Since Portland Golf's fixed costs, by definition, have been incurred even in the absence of sales to nonmembers, the Tax Court concluded that these costs should be disregarded in determining petitioner's intent to profit.

The Commissioner has taken no firm position as to the precise manner in which Portland Golf's fixed costs are to be allocated between member and nonmember sales. Indeed, the Commissioner does not even insist that any portion of petitioner's fixed costs must be attributed to nonmember activities in determining intent to profit.[17] He does insist, however, that the *same* allocation method is to be used in determining petitioner's intent to profit as in computing its actual profit or loss. See Brief for Respondent 44–46. In the present case the parties have stipulated that the gross-to-gross method provides a reasonable formula for allocating fixed costs, and Portland Golf has used that method in calculating the losses incurred in selling food and drink to nonmembers. The Commissioner contends that petitioner is therefore required to demonstrate an intent to earn gross receipts in excess of fixed and variable costs, with the allocable share of fixed costs being determined by the gross-to-gross method.

Although the Court of Appeals' opinion is not entirely clear on this point, see n. 8, *supra,* that court seems to have taken a middle ground. The Court of Appeals expressly rejected the Tax Court's assertion that profit motive could be estab-

---

[17] The parties stipulated that the gross-to-gross formula was a reasonable method of allocating fixed expenses. App. 17. In his brief to this Court, however, the Commissioner states: "There may be room to debate whether the fixed costs allocated by petitioner to its nonmember sales constitute true economic costs of that activity that ought to be treated as 'directly connected' to the production of the nonmember sales income. It might be argued that only the variable costs are 'directly connected with' the nonmember activity, and therefore that only those variable costs should offset the gross receipts from the nonmember income." Brief for Respondent 45, n. 24.

lished by a showing that gross receipts exceeded variable costs; the court insisted that *some* portion of fixed costs must be considered in determining intent to profit. The court appeared, however, to leave open the possibility that Portland Golf could use the gross-to-gross method in calculating its actual losses, while using some *other* allocation method to demonstrate that its sales to nonmembers were undertaken with a profit motive.[18]

We conclude that the Commissioner's position is the correct one. Portland Golf's argument rests, as the Commissioner puts it, on an "inherent contradiction." Brief for Respondent 44. Petitioner's calculation of actual losses rests on the claim that a portion of its fixed expenses is properly regarded as attributable to the production of income from nonmember sales. Given this assertion, we do not believe that these expenses can be ignored (or, more accurately, attributed to petitioner's exempt activities) in determining whether petitioner acted with the requisite intent to profit. Essentially the same criticism applies to the Court of Appeals' approach. That court required petitioner to include *some* portion of fixed expenses in demonstrating its intent to profit, but it left open the possibility that petitioner could employ an allocation method different from that used in calculating its actual losses. Under that approach, some of petitioner's fixed expenses could be attributed to exempt functions in determining intent to profit and to nonmember sales in establishing the club's actual loss. This, like the rationale of the Tax Court, seems to us to rest on an "inherent contradiction."

Petitioner's principal response is that § 162 requires an intent to earn an *economic* profit, and that this is quite different from an intent to earn *taxable income*. Portland Golf emphasizes that numerous provisions of the Code establish

---

[18] See n. 8, *supra*. The Tax Court noted that petitioner would have shown a profit on sales to nonmembers in both 1980 and 1981 if fixed costs had been allocated under the "actual use" method. See 55 TCM 212, 213 (1988), ¶ 88,076 P–H Memo TC 412, 413.

deductions and preferences which do not purport to mirror economic reality. Therefore, petitioner argues, taxpayers may frequently act with an intent to profit, even though the foreseeable (and, indeed, the intended) result of their efforts is that they suffer (or achieve) tax losses. Much of the Code, in petitioner's view, would be rendered a nullity if the mere fact of tax losses sufficed to show that a taxpayer lacked an intent to profit, thereby rendering the deductions unavailable. In Portland Golf's view, the parties have stipulated only that the gross-to-gross formula provides a reasonable method of determining what portion of fixed expenses is "directly connected" with the nonexempt activity for purposes of computing *taxable income*. That stipulation, Portland Golf contends, is irrelevant in determining the portion of fixed expenses that represents the *actual economic cost* of the activity in question.

We accept petitioner's contention that § 162 requires only an intent to earn an economic profit. We acknowledge, moreover, that many Code provisions are designed to serve purposes (such as encouragement of certain types of investment) other than the accurate measurement of economic income. A taxpayer who takes advantage of deductions or preferences of that kind may establish an intent to profit even though he has no expectation of realizing taxable income.[19] The fixed expenses that Portland Golf seeks to allo-

---

[19] The Tax Court consistently has held that the possibility of realizing tax benefits should be disregarded in determining whether an intent to earn an economic profit has been shown. (That is, the reduction in tax liability cannot itself be the "profit.") See, *e. g.*, *Gefen v. Commissioner*, 87 T. C. 1471, 1490 (1986) ("A transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits"); *Seaman v. Commissioner*, 84 T. C. 564, 588 (1985) ("'[P]rofit' means economic profit, independent of tax savings"); *Surloff v. Commissioner*, 81 T. C. 210, 233 (1983) (same). Accord, *Simon v. Commissioner*, 830 F. 2d 499, 500 (CA3 1987). Portland Golf does not dispute this principle. See Brief for Petitioner 39 ("The cases have uniformly held that taxable businesses, in order to deduct expenses in excess of income, need only show an 'eco-

cate to its nonmember sales, however, are deductions of a
different kind.   The Code does not state that fixed costs are
allocable on a gross-to-gross basis irrespective of economic
reality.   Rather, petitioner's right to use the gross-to-gross
method rests on the club's assertion that this allocation for-
mula reasonably identifies those expenses that are "directly
connected" to the nonmember sales, § 512(a)(3)(A), and are
"the ordinary and necessary expenses paid or incurred" in
selling food and drink to nonmembers, see § 162(a).[20]   Lan-
guage such as this, it seems to us, reflects an attempt to
measure economic income—not an effort to use the tax law to
serve ancillary purposes.   Having calculated its actual losses
on the basis of the gross-to-gross formula, petitioner is there-
fore foreclosed from attempting to demonstrate its intent to
profit by arguing that some other allocation method more ac-
curately reflects economic reality.[21]

---

nomic profit' independent of tax savings, or 'economic gain' independent of
tax savings") (footnotes omitted).   We therefore assume, without decid-
ing, that potential reductions in tax liability are irrelevant to the deter-
mination whether a profit motive exists.

[20] As stated earlier, § 512(a)(3)(A) limits deductions from unrelated busi-
ness taxable income to "deductions allowed by this chapter."   In the
present case, petitioner may offset losses from nonmember sales against
investment income only if those losses are deductible under § 162.   That
Code provision states: "There shall be allowed as a deduction all the ordi-
nary and necessary expenses paid or incurred during the taxable year in
carrying on any trade or business."   Thus, the expenses petitioner seeks
to deduct will constitute "deductions allowed by this chapter" only if they
are "the ordinary and necessary expenses paid or incurred" in selling food
and drink to nonmembers.

[21] We do not hold that, for other cases, any particular method of allocat-
ing fixed expenses must be used by social clubs.   We hold only that the
allocation method used in determining actual profit or loss must also be
used in determining whether the taxpayer acted with a profit motive.   Pe-
titioner here has stipulated, however, to the reasonableness of the gross-
to-gross method and has used that method in calculating its actual losses.
We note that no other allocation method, used consistently, would have
produced a result more favorable to petitioner.   Had petitioner employed
the actual-use method, or ignored fixed costs entirely, it could have estab-

## IV

We hold that any losses incurred as a result of petitioner's nonmember sales may be offset against its investment income only if the nonmember sales were undertaken with an intent to profit. We also conclude that in demonstrating the requisite profit motive, Portland Golf must employ the same method of allocating fixed expenses as it uses in calculating its actual loss. Petitioner has failed to show that it intended to earn gross income from nonmember sales in excess of its total (fixed plus variable) costs, where fixed expenses are allocated using the gross-to-gross method.[22] The judgment of the Court of Appeals is therefore affirmed.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR and JUSTICE SCALIA join, concurring in part and concurring in the judgment.

The Tax Court found that Portland Golf Club's nonmember activity qualified as a trade or business under § 162(a) of the

---

lished its intent to profit, but it would have realized a net gain from nonmember sales and its "unrelated business taxable income" would have been higher.

[22] The fact that petitioner suffered actual losses in 1980 and 1981 does not, by itself, prove that Portland Golf lacked a profit motive. A taxpayer's intent to profit is not disproved simply because no profit is realized during a particular year. See Treas. Reg. § 1.183–1(c)(1)(ii), 26 CFR § 1.183–1(c)(1)(ii) (1989) (most activities presumed to be engaged in for profit if gross income exceeds costs in any two of five consecutive years); Treas. Reg. § 1.183–2(b)(6), 26 CFR § 1.183–2(b)(6) (1989) ("A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit"). Petitioner could offset these losses against investment income if it could demonstrate that it *intended* to earn gross income in excess of total costs, with fixed expenses being allocated under the gross-to-gross formula. Portland Golf has not asserted, however, that it possessed such a motive. The club's reluctance to make that argument is understandable: In every year from 1975 through 1984, petitioner incurred losses from its sales to nonmembers when fixed costs are allocated on a gross-to-gross basis. 55 TCM. at 213. ᵠ 88,076 P–H Memo TC. at 413.

Internal Revenue Code of 1954, 26 U. S. C. § 162(a), and it allowed the club to deduct expenses associated with the activity from its income.    55 TCM 212 (1988), ¶ 88,076 P–H Memo TC.   The Court of Appeals remanded because it found the club's profit motive unclear.   App. to Pet. for Cert. 1a, judgt. order reported at 876 F. 2d 897 (1989).   Although the Tax Court had determined that the club intended the gross receipts from the nonmember activity to exceed the direct costs, the Court of Appeals held that § 162(a) requires an intent to produce gains in excess of both direct and indirect costs.   The Court of Appeals remanded the case to allow the Tax Court to reconsider the club's profit motive, taking account of the overhead and other fixed costs attributable to the nonmember activity.   I agree with that decision, and so would affirm the Court of Appeals.

I join all but Parts III–B and IV of the Court's opinion.   I otherwise concur only in the judgment because the Court decides a significant issue that is unnecessary to our disposition of the case and, in my view, decides it the wrong way. When the Court of Appeals instructed the Tax Court to consider the club's indirect costs, it did not specify how the club should allocate these costs between its member and nonmember activities.   In particular, it left open the possibility that the club could use one allocation method to calculate its expenses under § 162(a), while using some other allocation method to demonstrate its profit motivation.   See *ante*, at 167–168.   Although the Court purports to affirm the Court of Appeals, its opinion eliminates this possibility, and thus works a dramatic change in the remand order.   The Court rules in Parts III–B and IV that, if the club uses the so-called gross-to-gross method to allocate its fixed costs when computing its expenses, it must use the same allocation method to prove its profit motivation.   The Tax Court and Court of Appeals, in my view, should have had the opportunity to consider this issue in the first instance.   Because the Court has

reached the question, however, I must state my disagreement with its conclusion.

A taxpayer's profit motive, in my view, cannot turn upon the particular accounting method by which it reports its ordinary and necessary expenses to the Internal Revenue Service (IRS). The Court cites no authority for its novel rule and we cannot adopt it simply because we confront a hard case. Section 162(a) provides: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ." 26 U. S. C. § 162(a). Although the section does not require a profit motivation by its express terms, we have inferred such a requirement because the words "trade or business," in their ordinary usage, contemplate activities undertaken to earn a profit. See *Commissioner* v. *Groetzinger*, 480 U. S. 23, 27–28 (1987); *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 171 (1911). Yet, I see no justification for making the profit-motive requirement more demanding than necessary to distinguish trades and businesses from other activities pursued by taxpayers. See *Whipple* v. *Commissioner*, 373 U. S. 193, 197 (1963). Because an activity may be a trade or business even if the taxpayer intended to show losses on its income tax forms under a permissible accounting method, the Court endorses an improper conception of profit motivation.

A taxpayer often may choose from among different accounting methods when computing its ordinary and necessary expenses under § 162(a). In this case, as stipulated by the IRS, the club could have allocated its fixed costs either by the gross-to-gross method or by the so-called actual-use method. Although the gross-to-gross method showed a net loss for the relevant tax years, the actual-use method would have shown a net profit. See *ante*, at 158, n. 5. If profit motivation turns upon the allocation method employed by the club in filling out its tax forms, then the status of the nonmember activity as a trade or business may lie within the control of

the club's accountants. I find this interpretation of the words "trade or business" simply "to affront common understanding and to deny the facts of common experience." *Helvering* v. *Horst*, 311 U. S. 112, 118 (1940). A taxpayer does not alter the nature of an enterprise by selecting one reasonable allocation method over another.

The Court's decision also departs from the traditional practice of the courts and the IRS. Rather than relying on strict consistency in accounting, the courts long have evaluated profit motivation according to a variety of factors that indicate whether the taxpayer acted in a manner characteristic of one engaged in a trade or business. See, *e. g., Teitelbaum* v. *C. I. R.*, 294 F. 2d 541, 545 (CA7 1961); *Patterson* v. *United States*, 198 Ct. Cl. 543, 552–553, 459 F. 2d 487, 493–494 (1972); see Boyle, What is a Trade or Business?, 39 Tax Law. 737, 743–745 (1986); Lee, A Blend of Old Wines in a New Wineskin: Section 183 and Beyond, 29 Tax L. Rev. 347, 390–447 (1974). In a regulation based on a wide range of prior court decisions, the IRS itself has explained § 162 and profit motivation as follows:

> "Deductions are allowable under section 162 for expenses of carrying on activities which constitute a trade or business of the taxpayer and under section 212 for expenses incurred in connection with activities engaged in for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. Except as provided in section 183 and [26 CFR] § 1.183–1 [which authorize individuals and S-corporations to offset hobby losses], no deductions are allowable for expenses incurred in connection with activities which are not engaged in for profit. . . . The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances

must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit." 26 CFR § 1.183–2(a) (1989).

To facilitate the application of this general standard, the IRS has supplied a list of nine factors, also based on a wide body of case law, for evaluating the taxpayer's profit motive. These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. See §§ 1.183–2(b)(1) to (9).

The Court today limits this longstanding approach by pinning the profit-motive requirement to the accounting method that a taxpayer uses to report its ordinary and necessary expenses under § 162(a). Although the tax laws in general strive to reflect the true economic income of a taxpayer, the IRS at times allows taxpayers to use accounting methods that understate their income or overstate their expenses. In this case, as the Court itself acknowledges, the IRS stipulated that the club could use the gross-to-gross allocation method to calculate its expenses under § 162(a) even though this method tends to exaggerate the percentage of fixed costs attributable to the club's nonmember sales. See *ante*, at 157–158, n. 4. Yet, I see no basis for saying that, when the club took advantage of this unconditional stipulation, it committed itself to the legal position that the gross-to-gross method best reflects economic reality. Some inconsistency will exist if the club uses the gross-to-gross allocation method in computing the expenses, while using some other reasonable accounting method to prove that it undertook the nonmember activity

as a trade or business. But the solution to this inconsistency lies in altering the stipulation in other cases, not in changing the longstanding interpretation of profit motivation.

The precise effect of the Court's holding with respect to the club remains unclear. The Court states only that the club may not offset its losses from nonmember sales against its investment income. But I do not understand how the Court can confine its ruling to investment income alone. If the club's nonmember activity does not qualify as a trade or business, then the club cannot use § 162(a) to deduct *any* of the expenses associated with the nonmember activity, not even to the extent of gross receipts. Confronted with this difficulty at oral argument, respondent stated that, in the absence of statutory authority, the IRS has allowed an offset of expenses against gross receipts out of its own "generosity," a characteristic as rare as it is implausible. Tr. of Oral Arg. 42–43. The IRS, indeed, asserts the authority to disallow the offset in the future. See *id.*, at 44. Cf. 26 U. S. C. § 183 (authorizing individuals and S-corporations to offset hobby losses). This possibility further counsels against making the profit-motive requirement more stringent than necessary to determine whether the club undertook the nonmember activity as a trade or business. For these reasons, I join the Court's opinion, with the exception of Parts III–B and IV, and concur in the judgment.