NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0040n.06
Filed: January 12, 2007

No. 05-6629

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **ISSAC B. TIGRETT II,** | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE:     COOK and McKEAGUE, Circuit Judges; and WILHOIT, District Judge.***

**McKEAGUE, Circuit Judge.**     Plaintiff-appellant Issac B. Tigrett II filed amended individual income tax returns for tax years 1994-1997, seeking refunds of taxes paid. Before the Internal Revenue Service responded to the amended returns, Tigrett instituted this action to preserve his rights. After a bench trial, the district court awarded judgment substantially in favor of the United States, finding that Tigrett had failed to carry his burden of proving entitlement to the claimed business deductions. On appeal, we find no error and therefore affirm the judgment of the district court for the reasons that follow.

_____

     * The Honorable Henry R. Wilhoit, Jr., Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are largely undisputed. Plaintiff-appellant Issac B. Tigrett II[1] is a developer and promoter of restaurant and entertainment venues. He created the original "Hard Rock Café" in London in 1971, and subsequently developed and refined the formula which has been duplicated in some 180 establishments in 60 countries worldwide. During the 1990s, Tigrett sought to reproduce his Hard Rock Café success using a different music theme, gospel and blues music, matched with the cuisine of the American South. He developed, promoted, financed and opened the first "House of Blues" restaurant in Cambridge, Massachusetts in 1992. From 1992 to 1997, he was chairman of the board of directors and chief executive officer of HOB Entertainment, Inc. ("HOB"), the corporation formed to develop the House of Blues concept. It was in connection with his efforts to promote the House of Blues concept that Tigrett personally incurred the $5 million expense which is at the center of this litigation.

The district court summarized the relevant facts and history of administrative proceedings as follows:

---

[1] In this court's case caption, appellant's first name appears as "Issac." In the lower court record, his name is consistently spelled in the more conventional way, "Isaac." While the discrepancy is noted in appellant's brief at p. 1, n. 1, he has not directly advised which version is correct and has not moved to correct the case caption. Hence, appellant is referred to herein as "Issac."

In early 1996, HOB was afforded the opportunity to open a temporary House of Blues venue in Centennial Park in Atlanta, Georgia, during the 1996 Olympic games. . . .

Because some of the members of the Board of Directors of HOB were concerned that the proposed Atlanta venue might not be successful, Plaintiff, along with board members Dan Ackroyd and Kit Goldsbury, agreed that in the event HOB lost money in connection with the Olympic venture they would contribute funds to cover the shortfall. [According to the later memorialized Contribution Agreement, Ackroyd and Goldsbury each agreed to contribute up to $1 million and Tigrett up to $5 million.] . . . Thereafter, HOB resolved to advance up to $7,000,000 in connection with the House of Blues Atlanta venture and established a subsidiary company, House of Blues Atlanta, Inc. ("HOB Atlanta"), to operate the temporary venue in Atlanta. HOB provided all of the capital used by HOB Atlanta in operating the temporary venue. HOB anticipated that the funds used for the temporary venue in Atlanta would be repaid from either the profits resulting from the venue or via the indemnification agreement.

The temporary venue was set up to operate during the Atlanta Olympic Games, but was closed for four and one-half days following the explosion of a bomb in Centennial Park. Ultimately, the accountants for HOB determined that HOB lost more than $10,000,000 from the operation of the temporary Atlanta venue. On October 23, 1996, the HOB Board of Directors requested that Plaintiff honor his agreement to indemnify HOB for such losses. . . . [I]n January of 1997 . . . Plaintiff paid HOB $5,000,000.

Plaintiff was terminated as Chief Executive Officer of HOB by October of 1997 . . . .

Dist ct. op. pp. 3-5, JA 20-22.[2]

Plaintiff timely filed tax returns for the years 1994, 1995, 1996, and 1997. On November 17, 2000, Plaintiff timely filed amended tax returns for 1994, 1995, 1996, and 1997, claiming a refund of Federal income taxes in the amount of $34,846 for 1994, $143,043 for 1995, $121,075 for 1996, $122,764 for 1997 and $105,990 for 1998. The amended returns claimed a loss for the year 1997 and a carry-back to reduce Plaintiff's tax liability for 1994, 1995, and 1996. While the Internal Revenue Service issued a refund for the year 1998 based on a carry-forward of the 1997 loss, the Internal Revenue Service took no action regarding Plaintiff's 1994, 1995, 1996,

---

[2]The bombing at Centennial Park was an act of domestic terrorism that resulted in two deaths and injuries to 111 persons. Eric Robert Rudolph pleaded guilty to the offense in 2005 and has been sentenced to life imprisonment.

and 1997 tax refund claims for more than a year after the refund claims were filed. Because the Internal Revenue Service declined to enter an agreement tolling the limitations period provided by the Internal Revenue Code, Plaintiff filed this suit to preserve his rights. Plaintiff exhausted all administrative remedies available to him prior to filing this suit.

*Id*. at 2, JA 19.

After denying cross-motions for summary judgment, the district court conducted a one-day bench trial on November 22, 2004. Tigrett was the only witness at trial. The district court expressly found Tigrett to be credible and found his testimony to be consistent with the allegations of his complaint and with the joint final pretrial order. The court nonetheless held, in relevant part, that Tigrett had failed to carry his burden of demonstrating entitlement to claim a deduction for the $5 million expense either as an ordinary business expense under 26 U.S.C. § 162, or as a business loss under 26 U.S.C. § 165(c)(1). Since Tigrett was not the prevailing party, his request for attorney's fees under 26 U.S.C. § 7430 was also denied. Tigrett now appeals all three of these determinations. In response, defendant-appellee United States renews its jurisdictional challenge.

## II. JURISDICTION

The government contends that Tigrett did not properly exhaust his administrative remedies as to the particular theories which are the subject of this appeal, and that the district court therefore lacked jurisdiction to entertain them. Hence, the argument goes, even if this court were inclined to reverse the district court's judgment on the merits of Tigrett's claim, the district court lacks jurisdiction to grant the relief sought. The district court summarily rejected the jurisdictional challenge, concluding, upon review of the record, that Tigrett's claim for refund generally set forth the material facts; that the claim adequately alerted the IRS to the grounds for refund; and that Tigrett

had not asserted a whole new factual basis or legal theory in the court proceedings. The district

court's jurisdictional ruling is subject to *de novo* review. *Palkow v. CSX Transp., Inc.*, 431 F.3d 543,

548 (6th Cir. 2005) (subject matter jurisdiction reviewed *de novo*); *Lockheed Martin Corp. v. United*

*States*, 210 F.3d 1366, 1370 (Fed. Cir. 2000) (variance issue reviewed *de novo*).

The government has correctly stated the general proposition, summarized as follows in *Young*

*v. United States*, 332 F.3d 893, 894-95 (6th Cir. 2003):

> "Federal courts have no jurisdiction to entertain taxpayer allegations that
> impermissibly vary or augment the grounds originally specified by the taxpayer in the
> administrative refund claim." *McDonnell v. United States*, 180 F.3d 721, 722 (6th
> Cir.1999) (quoting *Charter Co. v. United States*, 971 F.2d 1576, 1579 (11th
> Cir.1992)). This rule prevents surprise and adequately notifies the IRS of the claim
> and its underlying facts. *Id.* Accordingly, "[w]hen a party fails to state with
> specificity the grounds for the refund, the court is without jurisdiction to entertain the
> action." *Id.*

Hence, several questions are implicated by the government's jurisdictional challenge. Has Tigrett

stated the asserted grounds for the claimed refund with sufficient specificity? Is the claim stated

clearly enough to avoid unfair surprise and adequately apprise the government of the claim and its

underlying facts? Do the grounds for relief asserted in Tigrett's complaint impermissibly vary from

those asserted in the administrative claim for refund?

Tigrett concedes that his amended tax returns do not assert the specific Internal Revenue

Code provisions under which he claimed entitlement to refunds. Indeed, there is no such

requirement. Tigrett's amended returns were accompanied, however, by a three-page explanation

of the undisputed facts said to justify the amended returns and the claimed deductibility of his $5

million business loss or expense. Further, none of the theories asserted in the district court action

is stated any more specifically in his district court complaint than in his amended returns. In other words, there is no material variance between the administrative claim and the complaint. Nor is any theory that Tigrett ultimately asserted in the district court at odds with his administrative claim or his complaint.

To be sure, the legal theories could have been stated more specifically. Yet, the government gave Tigrett no reason to believe his claim was too vague or indefinite. First, the IRS granted the claimed refund for 1998, based on the very same business loss asserted in connection with the other years. This would appear to imply that the IRS not only understood but also approved of his claim. Second, the amended returns for 1994 through 1997 remained pending for over a year without any response from the IRS before Tigrett decided to file suit. During this time, the IRS did not seek additional information or respond in any fashion that suggested the need for greater specificity or clarification. Third, even after the district court action was commenced, the government never moved for a more definite statement of Tigrett's claim. The government first raised concern about the specific nature of the grounds for Tigrett's claim in response to his motion for summary judgment. When the district court overruled the objection, the government subsequently conceded jurisdiction in the parties' joint final pretrial order. The government was then afforded a full and fair opportunity to contest each of Tigrett's theories on the merits in trial.

Under these circumstances, the suggestion that the district court should have refrained from exercising jurisdiction because the government was unfairly surprised and denied a fair opportunity to resolve the matter administratively rings hollow. There simply is no reason to conclude that the government's handling of the claimed refund was in any way prejudiced as a result of Tigrett's

failure to originally identify the precise legal theories on which he relied. Considering this history of proceedings, we conclude that Tigrett's administrative claim contained the requisite specificity to give the IRS adequate notice of the grounds for refund, and that the theories asserted in the district court did not impermissibly vary from the grounds set forth in the administrative claim. The district court's rejection of the government's jurisdictional challenge was therefore proper.

### III. ANALYSIS OF MERITS

Tigrett contends the district court erred, however, on the merits of his claimed deductions. Income tax deductions are "matters of legislative grace" and are construed strictly in favor of the government. *Intermet Corp. & Subsidiaries v. Comm'r*, 209 F.3d 901, 904 (6th Cir. 2000). The taxpayer bears the burden of proving entitlement to a claimed deduction. *Id*. The district court's findings of fact are reviewed for clear error and its applications of the law to the facts are reviewed *de novo*. *Friedman v. Comm'r*, 216 F.3d 537, 542 (6th Cir. 2000).

### A. § 162 Ordinary Business Expense

Tigrett contends his $5 million payment to HOB pursuant to the Contribution Agreement was deductible as an ordinary business expense under 26 U.S.C. § 162. The district court was satisfied that the payment was made in relation to Tigrett's business, but held the expense was not "ordinary."

Section 162(a) of the Code allows deduction of all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162(a). As a threshold matter, "a taxpayer's activities fall within the scope of § 162 only if an intent to profit has been shown." *Portland Golf Club v. Comm'r*, 497 U.S. 154, 164 (1990). To be engaged in a

"trade or business," a taxpayer must be involved in the activity with continuity and regularity for the purpose of income or profit; sporadic activities, hobbies and recreational diversions do not qualify. *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987).

To be deductible, an expense must be "ordinary and necessary" and must not be a capital expenditure. *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 85-86 (1992). An "ordinary expense" is generally one of "common or frequent occurrence in the type of business involved." *Id.* (*quoting Deputy v. Du Pont*, 308 U.S. 488, 495 (1940)). A capital expenditure is one made to create or enhance a separate and distinct asset, one that may be expected to yield benefits beyond the year in which the expense is incurred. *INDOPCO,* 503 U.S. at 86-87. Whether a payment is a current expense, and therefore "ordinary" and deductible, or, on the other hand, a non-deductible capital expenditure, is a fact-specific question that may turn on distinctions of degree rather than of kind. *Id*. at 86. "Although the mere presence of an incidental future benefit—'*some* future aspect'— may not warrant capitalization, a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization." *Id*. at 87.

Applying these standards to the record facts, the district court, in relation to the "trade or business" requirement, noted the parties' stipulation that Tigrett was "a developer and promoter of restaurant and entertainment businesses." Dist. ct. op. p. 16, JA 33. The court found, based on Tigrett's testimony, that his success as a developer and promoter involved developing a brand identity for a particular concept restaurant and entertainment venue, and then continuously building that brand nationally and/or internationally. *Id*. at 16-17, JA 33-34. The House of Blues Atlanta

venture afforded an opportunity to expose the House of Blues brand to an international audience. *Id*. at 17, JA 34. The court found the primary intended benefits of Tigrett's agreement to indemnify HOB were "to build the HOB brand and develop interest in a forthcoming initial public offering of shares." *Id*. at 14, JA 31. Finding that these intended benefits would serve not only HOB's business interests, but also Tigrett's professional interests as a developer and promoter, the district court held that Tigrett's "dominant motivation" for entering into the contribution agreement was related to his trade or business. *Id*. at 12 n. 5, JA 29. "In particular," the court explained, " the record indicates that Plaintiff may have been motivated to indemnify the HOB Atlanta venture, at least in part, in order to convince the HOB Board of Directors of his ability to promote the growth of the company and thereby secure his position as Chairman and Chief Executive Officer." *Id*.

The government does not concede that Tigrett was engaged in a trade or business, but neither does it contest the district court's finding. In response to Tigrett's appellate arguments for a § 162 deduction, the government stands on the correctness of the district court's holding that the contribution payment was not "ordinary." As to this element, the district court reasoned as follows:

> Having reviewed the record and considering the relevant factors, the Court finds that Plaintiff has failed to meet his burden to prove that his indemnification payment was an "ordinary" expense within the meaning of § 162. Although Plaintiff contends that he has entered into similar indemnification agreements in the past (Trial Tr. at 39-41), there is no evidence in the record to show that it is a common or frequent occurrence in the restaurant and entertainment business for an officer of a corporation to make a personal guarantee in an amount several times his annual salary to encourage the corporation to undertake a new venture. Additionally, the court finds that, based upon the evidence in the record, the primary intended benefits of Plaintiff's indemnification of the venture were to build the HOB brand and develop interest in a forthcoming initial public offering of shares. (Trial Tr. at 29, 64.) Those benefits would likely be realized outside of the taxable year – and

therefore are more appropriately treated as capital expenditures. Accordingly, Plaintiff's claim that he is entitled to a deduction under § 162 must also fail.

Dist. ct. op. p. 14, JA 31.

Tigrett contends the district court erred in holding the contribution payment to be a capital expenditure. He maintains that the contribution payment did not create or develop a distinct asset. Yet, he entered into the contribution agreement for the dual purposes of promoting the name recognition and goodwill associated with HOB and enhancing or protecting his reputation as an entrepreneur. Money spent enhancing reputation or good will is generally deemed to be a capital expenditure, because it is intended to create a future benefit, representing a capital asset. *See Welch v. Helvering*, 290 U.S. 111, 115-16 (1933). At the time he actually made the payment, however, he contends there was no longer a future benefit to be realized; the payment was made only to satisfy the indemnity obligation. Moreover, he insists that although contribution payments of this magnitude may not be commonly made by corporate officers, it is not an unusual undertaking for someone in the trade or business of developing concept restaurants and entertainment venues.

Tigrett's arguments are ultimately unpersuasive. The notion of viewing the contribution payment separately from the contribution agreement is artificial and at odds with the court's duty to undertake a fact-specific inquiry into the substance of the transaction. In making this inquiry and ascertaining Tigrett's motives, the purpose for the actual payment cannot be divorced from the purpose of Tigrett's assumption of the indemnification obligation in the first place. Clearly, if he had failed to make the promised $5 million indemnity payment, his reputation as an entrepreneur would have suffered greatly. In Tigrett's own words, "My reputation is key and following what I

say I'm going to do is very important to me, and I will do anything to protect that reputation . . . ."
Trial tr. p.40, JA 122. The actual payment was thus undeniably made in service of his original purpose, *i.e.*, to protect his reputation, a capital asset.

Moreover, Tigrett's characterization of the $5 million contribution payment as an "ordinary" expense rather than a capital expenditure is belied by the "Contribution Agreement," which by its very terms and form implies a contribution to capital. *See N. Am. Rayon Corp. v. Comm'r*, 12 F.3d 583, 586-87 (6th Cir. 1993) (generally, taxpayer's argument for tax consequences at odds with form of transaction must be supported by evidence of mistake, undue influence, fraud or duress). Tigrett's characterization of the payment as ordinary is undercut also by his own testimony that "[t]his was a very abnormal situation, very, very abnormal". . . "a once in a lifetime opportunity." Trial tr. pp. 40, 60, JA 122, 142**.** While Tigrett testified that he, as an entrepreneur, had previously invested substantial personal funds to support a Hard Rock Café venture, he did so then, too, not out of personal profit motive, but to safeguard his reputation. *Id*. at 39-40, JA 121-22. The record simply fails to substantiate that an expenditure of this magnitude by an individual entrepreneur, reimbursing corporate loss, comes within the realm of "normalcy," or "within the normal over-head [sic] or operating costs of such [entrepreneurial] activities," such as would justify treatment as an ordinary expense. *See Deputy v. Du Pont*, 308 U.S. at 496. Considering that the distinction between an ordinary expense and capital expenditure may depend on degree, rather than kind, the district court can hardly be faulted for its determination that this personal assumption and payment of a $5 million indemnity obligation, in connection with the unique opportunity posed by the Atlanta Olympic

- 11 -

Games, and covering corporate losses unforeseeably occasioned in part by an act of domestic terrorism, was anything but "ordinary."

To the extent such a finding entails fact-finding, the district court, having conducted the bench trial and had the opportunity to evaluate the credibility of the lone witness and assess the significance of trial exhibits, cannot be deemed to have clearly erred in its assessment of the record. To the extent the determination that the payment was not an ordinary expense entails a legal conclusion, Tigrett has failed to bear his burden of demonstrating error under the law. We find no error in the district court's rejection of Tigrett's claimed § 162 deduction.

### B. § 165(c)(1) Business Loss

Tigrett also contends his $5 million contribution payment to HOB was a loss incurred by him in a trade or business that was not compensated for by insurance or otherwise, and that should therefore be allowed as a deduction pursuant to 26 U.S.C. § 165(c)(1). Again, the district court was satisfied that Tigrett's $5 million payment was made in relation to his business of developing and promoting restaurant and entertainment venues. It concluded, however, that the payment was not a "loss" incurred in a trade or business because it was made pursuant to the indemnity or contribution agreement that Tigrett voluntarily entered into without consideration. Citing *A. Giurlani & Bros. v. Comm'r*, 119 F.2d 852, 857 (9th Cir. 1941), the court observed that generally, the voluntary payment of another's loss without any legal obligation to do so does not qualify as a loss pursuant to § 165.

Tigrett does not quarrel with this general proposition. He admits that he received no financial consideration for his promise to indemnify HOB. Yet, he insists that he made the contribution

payment involuntarily, pursuant to a legally binding and enforceable agreement. He contends the district court erred by failing to distinguish between the contribution agreement and the payment itself. At the time he entered into the agreement to indemnify HOB, voluntarily or not, Tigrett contends there was no debt or loss for him to voluntarily assume. When he actually made the $5 million payment several months later, Tigrett contends he *was* under a legal obligation to do so, consisting of the legally enforceable contribution agreement. In support, he cites *Putnam v. Comm'r*, 352 U.S. 82 (1956).

In *Putnam*, the Supreme Court recognized, for purposes of the deductibility of a non-business bad debt loss, that a "taxpayer who voluntarily buys a debt with knowledge that he will not be paid is rightly considered not to have acquired a debt but to have made a gratuity." *Id*. at 88. The taxpayer in such a case has not sustained a cognizable loss. In contrast, the court observed, the guarantor who pays a debt for another in compliance with his obligation under a contract of guaranty sustains a deductible loss not by virtue of the payment to the creditor, but by virtue of the debtor's ultimate inability to fulfill its obligation to reimburse the guarantor. *Id*. at 88-89.

As between these two examples, Tigrett contends he is unlike the former inasmuch as he, at the time he entered into the contribution agreement, did not have knowledge that HOB Atlanta would sustain losses for which he would have to indemnify HOB. When he did make the payment, it was not voluntarily, but in performance of his legally binding obligation, like the latter guarantor in the *Putnam* example, who was deemed to have sustained a deductible loss.

The government, on the other hand, maintains that *Putnam* supports its position. Indeed, when Tigrett entered into the contribution agreement, he did so voluntarily and gratuitously, without

consideration, and with knowledge that if HOB Atlanta did not succeed, he would be responsible to reimburse HOB for its investment loss without any expectation of reimbursement from HOB Atlanta. That is, Tigrett, like the former taxpayer in the *Putnam* example, voluntarily assumed responsibility for any loss with advance knowledge that he would not be paid. Thus, even under the teaching of *Putnam*, Tigrett's assumed obligation was a gratuity, and is not a deductible loss.

Moreover, as the government correctly contends, if the $5 million payment was not a gratuity, it was an investment in capital assets (*i.e.*, Tigrett's reputation as an entrepreneur as well as HOB's brand identity), which is not deductible as an ordinary business loss under § 165(c)(1). *See In re Vaughan*, 719 F.2d 196 (6th Cir. 1983) (holding that, there being no economic difference between directly investing money in a corporation and indirectly investing money by promising to pay corporate debts, losses resulting from both activities are properly treated the same, as capital losses).

*Putnam* thus represents only illusory support for Tigrett's position. It was not unreasonable for the district court to find the teaching of *Clark v. Kavanagh*, 152 F.2d 49 (6th Cir. 1945), more instructive. In *Clark*, the taxpayer, a testamentary trustee, paid an obligation pursuant to an eight-year-old indemnity agreement, an agreement which he had entered into for "the preservation of his reputation in financial circles." *Id.* at 51. The court "assumed without deciding" that the trustee, in the execution of the trust, was engaged in business. *Id*. Nonetheless, although the payment was made pursuant to a legally binding obligation, the obligation was deemed to be a personal one, gratuitously or voluntarily assumed. This preexisting voluntary character of the obligation was deemed to "merge" with the actual payment, rendering the payment itself personal or voluntary, too.

That is, the payment was deemed to be neither a loss incurred in the discharge of his duties as trustee nor a loss incurred in a transaction entered into for profit. *Id*. The payment was not a "loss." Accordingly, the payment was held not to be deductible as a loss incurred in a trade or business, or as a loss incurred in a transaction entered into for profit.

Tigrett argues that *Clark* is factually distinguishable. Yet, Tigrett has conceded that he, like the trustee in *Clark*, entered into the contribution agreement without any expectation of profit. *See Bessenyey v. Comm'r*, 379 F.2d 252, 256 (2d Cir. 1967) ("The established rule, approved by this circuit and others, is that deductibility of 'business-like' expenses or losses is denied unless the taxpayer can show an intention to seek profit.") Further, Tigrett, like the *Clark* trustee, was motivated to enter into the indemnity agreement in part by a desire to preserve and enhance his professional reputation. Moreover, his agreement to indemnify HOB, like the trustee's indemnity agreement in *Clark*, was not integral to his official role or business; it was personal and voluntary. All of these considerations support the district court's conclusion that the facts of *Clark* are sufficiently analogous and its analysis persuasive.

Tigrett argues *Clark* is distinguishable because the trustee's indemnity payment was not found to have been made in the trustee's trade or business, whereas he was engaged in his trade or business as a developer and promoter. While the Sixth Circuit in *Clark* did not identify the trade or business in which the trustee made the indemnity payment, it expressly "assumed," for purposes of its analysis, that he was engaged in a trade or business. *Clark*, 152 F.2d at 51. The claimed deduction was denied in *Clark* not because the trustee was not engaged in business, but because the indemnity payment was, due to the personal and voluntary nature of the obligation undertaken, not

- 15 -

a "loss." This, and not the trade or business element, represented the *ratio decidendi* for the holding in *Clark*. Hence, the district court, in following *Clark*, rightly focused on the voluntariness of Tigrett's contribution payment, stemming from the voluntary nature of the contribution agreement, as disqualifying it from deductibility as a business "loss."

On the present record, we conclude that Tigrett has failed to carry his burden of demonstrating entitlement to the deduction. *Putnam* represents only weak support for his argument and he has failed to persuasively distinguish the Sixth Circuit case law properly relied on by the district court. Hence, we find no error in the district court's judgment rejecting the second asserted basis for the claimed deduction.

## C. Estoppel

Finally, Tigrett contends the government should be estopped to deny him the claimed deduction for years 1994-1997 where it approved the same claimed deduction for 1998. Indeed, the only explanation for the inconsistent treatment of the claimed deduction in 1998 is that a mistake was made by the IRS. On this point, the district court agreed with the government that the IRS's erroneous treatment of an issue one year does not preclude its subsequent correction of its error in other tax years. *See Knights of Columbus Council No. 3660 v. United States*, 783 F.2d 69, 73 (7th Cir. 1986) ("The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of an error of law."); *Hawkins v. Comm'r*, 713 F.2d 347, 351-52 (8th Cir. 1983) (same). In fact, although there is no hint of detrimental reliance by Tigrett on the IRS's error in this case, the Commissioner has the power to correct legal errors retroactively even though the taxpayer may have

detrimentally relied on the error. *Knights of Columbus*, 783 F.2d at 73. Tigrett's argument for

estoppel is therefore unavailing.


## IV.  CONCLUSION

Entrepreneur Issac Tigrett undertook a huge financial gamble in furtherance of his personal

and professional interests and became the victim of unfortunate and unforeseeable circumstances.

His attempts to soften the blow through claimed deductions from his income tax liability have

proven unsuccessful.  On appeal, we must conclude, as we construe income tax deductions under

the Internal Revenue Code strictly in favor of the government, that he has failed to carry his burden

of demonstrating error in the district court's judgment.  The claimed deductions were properly

denied.  It follows that his claim for attorney's fees, as prevailing party, was also properly denied.

For the foregoing reasons, the judgment of the district court is in all respects **AFFIRMED.**