T.C. Memo. 2014-74

UNITED STATES TAX COURT

MERRILL C. ROBERTS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12010-11.                  Filed April 29, 2014.

<u>Francis J. Emmons</u>, for petitioner.

<u>Michael Dancz</u>, <u>Gorica Djuraskovic</u>, and <u>Grubert Roger Markley</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  On March 1, 2011, respondent issued a notice of deficiency

to petitioner determining deficiencies of $169,785, $617,119, $297,150, and

$297,640 for tax years 2005, 2006, 2007, and 2008, respectively.  Respondent also

determined that petitioner owed penalties under section 6662(a) of $33,957,

[*2] $123,424.80, $59,430, and $59,528 for tax years, 2005, 2006, 2007, and 2008, respectively.[1] Last, respondent determined petitioner owed an addition to tax under section 6651(a)(1) of $16,894 for the 2007 tax year.

The issues for decision are: (1) whether petitioner engaged in various horse-related activities during tax years 2005, 2006, 2007, and 2008 with the expectation of making a profit; (2) whether petitioner is liable for accuracy-related penalties under section 6662(a) for tax years 2005, 2006, 2007, and 2008; and (3) whether petitioner is liable for an addition to tax under section 6651(a)(1) for failure to timely file his Federal income tax return for the 2007 tax year.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits received into evidence are incorporated herein by this reference. Petitioner lived in Indiana when he filed the petition.

I. Background

In 1969 petitioner purchased an abandoned restaurant on Washington Street highway in Indianapolis, Indiana, around five miles from his current home. He worked two jobs and saved money for several years to be able to afford the

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] purchase. The restaurant had originally been built as part of the Horne's highway restaurant chain and came with a reputation of staying open 24 hours a day, seven days a week. An additional investor helped petitioner reopen the restaurant as a steakhouse called the Sherwood Inn. Petitioner, a high school graduate, did not perform any business studies or projections before opening the restaurant and instead anchored his business plan on "hard work". The Sherwood Inn was initially very successful but closed because of significant kitchen fire damage several months after opening.

Petitioner sought to collect on the restaurant's insurance policy and eventually settled his claim nearly a year after the Sherwood Inn had burned. Petitioner was left without a source of income and used his personal savings to support his family of three children during this time.[2] Because the insurance settlement was insufficient to rebuild a fully equipped restaurant, petitioner reopened the business as a bar around 1972.

The bar was near an airport and attracted airport employees at the end of their shifts. Specifically, "airport controllers" would often patronize petitioner's bar to celebrate passing certification tests. The "airport controllers" asked petitioner to arrange for exotic dancers to perform at the celebrations, and he

---

[2]Petitioner's wife was estranged from the family for medical reasons.

[*4] complied.  Soon thereafter, the nights featuring exotic dancers became popular and well-attended events.

Although petitioner recognized the financial potential of operating a gentlemen's club, he chose to sell the business for moral reasons around 1973. The sale agreement required the buyers to make payments directly to petitioner. Petitioner then opened a pizza parlor about five miles from his former bar. Around 1974 petitioner reclaimed the bar because the buyers failed to make payments.  After explaining the specific circumstances to his family, petitioner continued to operate the bar on Washington Street highway as a gentlemen's club called Dancers.

Dancers turned into a very profitable venture, and petitioner expanded his business by opening other nightclubs and restaurants.  At one point petitioner owned six operating establishments and a staffing company to coordinate personnel.  Every restaurant or bar that petitioner opened was eventually successful and was still operating at the time of trial.

Petitioner actively participated in trade organizations that supported the nightclub industry.  Petitioner originally joined the associations to learn about the industry and to stay current on industry techniques.  Eventually petitioner ascended to multiple leadership roles within the organizations.  Petitioner

[*5] ultimately was president of the Indiana Licensed Beverage Association for four years and president of the Indiana Nightclub Association for eight years. The organizations helped nightclub owners--like petitioner--protect their investments by advocating for the businesses' specific interests. For example, the organizations helped defend bars against disgruntled neighbors who were unhappy with a bar's location or late hours. Petitioner undoubtedly learned valuable lessons from the trade organizations and implemented the valuable knowledge in his own operations.

Petitioner also expanded his business activities by investing in real estate. One of the properties that petitioner acquired was a 50-acre parcel of land that fronted Washington Street. This parcel, bought in 1987, was directly across the street from Dancers and about five miles from petitioner's current home. Petitioner paid about $250,000 for the 50 acres and rented it to a farmer for around 10 years. In 1997 or 1998 petitioner bought a 45-acre parcel of land directly north of the 50-acre parcel for around $400,000.[3] The former owner had used this land to board horses, and there was an operational stable on the property. Petitioner recognized there was a small income potential from the stable but actually

---

[3]The 45-acre parcel fronted Morris Street. These two parcels are collectively referred to as the Morris Street property to avoid confusion with Dancers, which is also on Washington Street.

**[*6]** intended to capitalize on the land by creating a 95-acre contiguous plot and through appreciation, not through stable rental receipts.

In the mid-1990s petitioner began to ease out of the nightclub industry. Around this time he sold all of his shares of the nightclub business to his three grown children. Petitioner also eventually relinquished control of his nightclub businesses but continued to consult with the new management team. Because petitioner had over 30 years of experience in the nightclub industry and his experience was a valuable asset to the businesses, he created a new corporate entity to structure a management consulting agreement. As his adult children became more experienced, petitioner transitioned from his previous onsite management to providing most of his day-to-day services through cell phone consultations. Petitioner's newly adopted cell phone management style and reduced interest in his nightclub businesses allowed him to think about long-term life goals.

Around the time petitioner bought the Morris Street property, he was contemplating a career change. He read that owning restaurants and nightclubs was a particularly dangerous occupation and decided to change his life. Petitioner started participating less in the nightclub businesses and started an insulation company as well as a used car dealership. While petitioner did not lose money in

[*7] these new endeavors, he was not happy working his new jobs. He was eventually bought out of the insulation business, and he chose to close the car dealership.

II. Horse-Related Activities

In 1998 or 1999 the Indiana Thoroughbred Owners and Breeders Association invited petitioner--as an owner of a horse boarding stable--to attend a free dinner and a tour of Hoosier Park, the first horse racing track to be opened in Indiana. The breeders association presented basic information about horse racing and the potential financial gains associated with the activity. Petitioner was interested in the financial prospect of horse racing even though he had been to a horse track only once before the event.

Petitioner asked a trainer who already worked at his boarding stables to "show [him] the ropes" of horse racing. The trainer taught petitioner some initial basic horse skills, and petitioner decided to acquire his owner's license. In 1999 petitioner purchased his first two young horses for $1,000 each and proceeded to work with his trainer to prepare the young horses for the racetrack. Petitioner also bought two horse racing videos to help explain more about horse racing and built his first training track on the Morris Street property. In his first year of racing petitioner's net income was around $18,000 from his two horses. Petitioner

[*8] recognized the ease of accounting for only two horses, but he was also enticed by the profit potential of racing more horses. He decided he liked the activity and bought more horses.

Petitioner used several trainers in his first few years of horse racing and learned more about the industry.[4] He increased his personal racing stable from 2 horses in 1999 to 10 horses in 2001 and also bought a breeding stallion. If he had a question about the business that his trainer could not answer, petitioner would turn to other experienced trainers because he did not "have twenty years to learn". Petitioner began working every day at the Morris Street property to develop the skills needed to become a licensed trainer, and he passed the trainer's license test in 2002. Unlike an owner's license, the trainer's license is much harder to obtain, and the State of Indiana required an applicant to pass a rigorous test on a range of subjects from horse bridle construction to equine medication.

In 2004 petitioner started consulting a specialized professional called a blood stock agent for horse purchasing and breeding advice so he could substantially expand the bloodlines of the horses in his breeding program. By 2005 petitioner felt comfortable with his knowledge of horse racing and wanted to build his own horse training facility on the Morris Street property. The original

---

[4]Some of petitioner's trainers passed away, and he fired others for cause.

[*9] boarding stable was in disrepair and not suitable for petitioner's intended activity. Petitioner started building a new facility on the Morris Street property, but the City of Indianapolis attempted to stop him from training horses despite the agricultural zoning of the property. The city raised his property taxes from around $1,000 to $17,000 per year and was fining him $100 for every day that he was out of compliance. Further, before he could construct any new structures, the city required all new buildings, including barns, to meet strict city building codes. For example, the city required petitioner to hire an architect to design and draw the proposed barns before construction could commence. The city's actions discouraged petitioner from building on the Morris Street property, and he started looking for a new location to build a horse training facility.

Around 2005 an unrelated party offered to buy the entire 95-acre Morris Street property from petitioner for around $2.2 million,[5] and in June 2006 petitioner closed the sale. Petitioner chose to recognize gain on the 45-acre parcel and reinvest the proceeds from the 50-acre parcel through a section 1031 exchange into property that would be better suited for training horses.[6] On June 20, 2006,

---

[5]As noted, the Morris Street property, also includes the abutting Washington Street property. See supra note 3.

[6]Instead of recognizing a $902,887 gain from the 50-acre parcel, petitioner
(continued...)

**[*10]** petitioner purchased a 180-acre parcel of land near Mooresville, Indiana-- around 16 miles from his current home--for $1 million, and within the next six months he invested between $500,000 and $600,000 in building improvements for a horse training facility.[7] Petitioner recognized the land would probably appreciate because of its proximity to a planned highway project, but he sought the land specifically to suit his horse-related activities.

Petitioner decided to build a first-class training facility on the Mooresville property, and he sought out expert advice for its design. He asked his trusted blood stock agent to help design the new training facility, and the bloodstock agent advised petitioner on many aspects of the new facility. The facility-- completed and placed in service in 2007--includes a large training track, portable horse stalls, unique rehabilitation equipment, several specialized training areas, and small apartments for employees. In petitioner's view, he built an extraordinary training facility unmatched in the State of Indiana, offering the unique aspect that his facility is used to condition horses rather than race horses.

---

[6](...continued)
chose to defer the gain through a sec. 1031 exchange.

[7]The exact costs of improvements are unknown because these records were destroyed in a 2012 fire.

[*11] As a new participant in the race horse industry petitioner developed his own training philosophy. He determined that to be successful he needed to motivate a horse to race rather than force the horse to race, and he built his horse facilities specifically for conditioning and motivating. The move to 180 acres also allowed him to offset his previously considerable hay expense by using a part of the Mooresville property to grow hay for his horses, and he purchased a significant amount of equipment to harvest and process the horse hay. In addition, the Mooresville property was large enough that petitioner rented out about 90 acres of the land for around $20,000 a year.

In the 2005 through 2008 tax years petitioner was involved in multiple aspects of the race horse industry, including boarding, breeding, training, and racing horses.[8] Petitioner primarily raced horses in Indiana but also raced at least 11 races per year in Kentucky and intermittently raced in other States including Ohio, Louisiana, North Dakota, Minnesota, and West Virginia.[9] Before buying the Mooresville property, petitioner split his time between the track and his training

---

[8]Collectively these activities will be referred to as petitioner's horse-related activities. The boarding and breeding activities were reported together, and the percentage of the activities the breeding program represented during tax years 2005 through 2008 is unclear.

[9]Petitioner believes that racing in at least 11 Kentucky races per year makes him eligible for a trainer-specific retirement plan.

**[*12]** operation, but in 2007 he hired a full-time assistant trainer when he started his operations at the Mooresville property. During racing season petitioner's assistant trainer worked at the racetrack while petitioner worked at the training facility. Petitioner structured the arrangement so that he collected fees when his trainer performed services for third parties. Petitioner did most of the manual labor to keep the facility in "excellent condition", while his assistant coordinated each horse on race day.

Petitioner's evenings were now generally spent choosing the races in which each horse would compete. He spent substantial time studying track condition books and picking specific races for specific horses. This required matching the attributes of a horse to the requirements of each race. If petitioner erred, he could have been fined for not meeting race requirements. But more importantly, because many of the races were "claiming races", his horse might have been purchased cheaply if the horse was worth more than the claiming amount.[10] In petitioner's view, "find[ing] the right race for the right horse * * *[i]s the secret to" the horse

---

[10]A claiming race is a race in which any entered horse may be purchased by any owner for a set price before the start of the race. For example, in a $10,000 claiming race any horse may be purchased before the race for $10,000, and the new owner takes delivery of the horse after the race. In other words, every time petitioner entered a horse into a claiming race, he risked losing the horse to a claimant. Accordingly, it was in petitioner's interest to match a specific horse to certain races according to the value or potential of the horse.

[*13] racing business, and it took him some time to learn the skill. To ensure compliance with racing regulations and entry strategy, petitioner would often confer with his assistant trainer about race entries. This strategy has produced some successful horses, and one of petitioner's horses was nominated to run in the Triple Crown Races.

Petitioner suffered several mishaps during his first few years of horse racing. Several of his best horse prospects were injured or killed in unfortunate accidents or lost during foaling season. For example, petitioner has lost numerous horses to lightning strikes and in-race injuries. Also, after moving to the Mooresville property petitioner was also swindled when a fence builder substituted flimsy poplar lumber to build a paddock fence rather than the agreed-upon oak. Before petitioner could rebuild the poplar fence, two stallions were spooked, stampeded through the fence, and died on the impaling timbers. The loss of the stallions and the cost of a replacement fence were serious setbacks to petitioner. Additionally, in 2008 many of his horses were captured in a quarantined stable when another owner's horse tested positive for a contagious infection within the same building. As a result petitioner could not race any of these horses for a significant part of the 2008 season.

**[*14]** III. <u>Professional Horse Racing Industry Activities</u>

Paralleling his participation in nightclub trade associations, petitioner joined several professional horse racing associations, and from 2005 through 2008 he served as a board member for two of the organizations.[11]  In 2007 petitioner's peers asked him to run for a leadership position within the Indiana Horsemen's Benevolent and Protective Association (HBPA).  The HBPA, in addition to other missions, was responsible for allocating broadcasting funds and negotiating race purse structure.  After serving as an HBPA board member for over a year, petitioner resigned to spend more time training horses.

Also similar to his nightclub professional activities, petitioner was involved in lobbying the Indiana State Legislature for horse racing interests.  Specifically, petitioner acted as a sounding board for his bloodstock agent, who was a key Indiana horse racing lobbyist.  When he was preparing to testify or lobby at the State legislature, the bloodstock agent would stay at petitioner's house, and petitioner would help the bloodstock agent prepare to testify in support of Indiana professional horse racing.  In the spring of 2007 the lobbying activities were successful and helped pass legislation to permit slot machines at racetracks.

---

[11]Petitioner served on only one board at a time because the professional associations forbid concurrent board membership.  He resigned in 2008 to spend more time training his horses.

[*15] House Bill No. 1835, the "slot bill", substantially increased the purses for horse racing in Indiana. For example, the new law increased a $13,000 purse to a $35,000 purse for one race. Further, the bill led to more races for unproven prospects, allowing trainers more opportunities to race young horses.

IV. Petitioner's Finances

Petitioner's certified public accountant (CPA) had handled his nightclub business accounting needs for about 20 years, and he used the same CPA for his horse-related activities. Petitioner first met this CPA through a mutual acquaintance after being dissatisfied with several other accountants. Petitioner continuously used this same CPA for his accounting needs, including representation during two audits before the tax years in issue. Neither of the prior audits resulted in an increased tax deficiency, and he continued to seek the CPA's tax advice on tax matters.

Petitioner used a rudimentary accounting system for all of his businesses, including his horse-related finances. Petitioner gave his CPA receipts for cash expenditures and relied on canceled checks and bank statements to track expenses. Some of these receipts were turned over to respondent in bundled reclosable plastic bags. For gross receipts, petitioner partly relied on a complex Internet database devoted to horse racing records. The Internet database is extensive and

[*16] tracks, inter alia, each horse, trainer, owner, and jockey. The database keeps detailed records of each horse's history, complete with total earnings, earnings per start, and earnings per year. The database is maintained by a private organization and is publicly available. Petitioner also tracked the cost of boarding a horse and the amount of feed each of his horses required. He knew the cost of keeping each of his horses at his property or boarding them elsewhere during the racing season.

For tax years 1999 through 2006 petitioner reported horse-racing income, expenses, and deductions from his horse-related activities on Schedules C, Profit or Loss From Business, of his personal income tax returns. In addition, he reported what was described as the horse farm portion of the income, expenses, and deductions on Forms 1120S, U.S. Income Tax Return for an S Corporation, for an S corporation he owned, Merrill C. Roberts, Inc. Petitioner then reported the net ordinary income or loss and any separately stated items reported by the S corporation on its corporate income tax returns on various schedules to his personal income tax returns for the corresponding years. Petitioner switched his tax reporting in 2007. Beginning in 2007 petitioner began reporting all of the horse-related income, expenses, and deductions on the S corporation forms. On his 2005 Schedule C petitioner reported income of $64,948 and deductions of $162,450 for a loss of $97,502 for his horse-related activities. The 2005 Form

[*17] 1120S shows income of $47,247 and deductions of $103,165 for a loss of $55,918 in horse-related activities. On his 2006 Schedule C petitioner reported income of $184,661 and $169,809 of deductions for a profit of $14,852. The 2006 Form 1120S shows income of $38,013 and deductions of $83,469 for a loss of $45,456. The 2007 Form 1120S shows income of $258,433 and deductions of $356,684 for a loss of $98,251. For tax year 2008, the year in which petitioner's horses were quarantined for a significant portion of the race season, the Form 1120S shows income of $65,563 and deductions of $357,451 for a loss of $291,888.[12]

In 2008 while preparing his 2007 tax return some of petitioner's financial records were permanently lost when a former girlfriend burned the records in a fireplace. Additionally, petitioner's personal returns reflect less than $3,000 in gambling income for all of the tax years in issue.

## OPINION

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer generally bears the burden of proving that the

---

[12]Petitioner may have reported additional income, deductions, and credits related to his horse-related activities on various other schedules for various years. For example, petitioner may have listed real estate rental income related to the horse activities on a Schedule E, Supplemental Income and Loss, and Form 4835, Farm Rental Income and Expenses.

**[\*18]** determinations are in error.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Taxpayers also bear the burden of proving that they are entitled to any deductions claimed.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  Taxpayers must maintain sufficient records to establish the amounts of allowable deductions and to enable the Commissioner to determine the taxpayers' correct tax liabilities.  See sec. 6001; Shea v. Commissioner, 112 T.C. 183, 186 (1999); sec. 1.6001-1(a), Income Tax Regs.

Section 7491(a) provides an exception that can shift the burden of proof to the Commissioner if the taxpayer introduces credible evidence regarding relevant factual issues and has:  (1) complied with all relevant substantiation requirements; (2) complied with all relevant recordkeeping requirements; and (3) cooperated with reasonable requests by the Commissioner for meetings, interviews, witnesses, documents, and information.  Sec. 7491(a)(1) and (2)(A) and (B).  Credible evidence is evidence that, after critical analysis, the Court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted.  Higbee v. Commissioner, 116 T.C. 438, 442 (2001).  A taxpayer who provides only self-serving testimony and inconclusive documentation has been held not to

**[\*19]** have provided credible evidence.  See id. at 445-446; Blodgett v.

Commissioner, T.C. Memo. 2003-212, aff'd, 394 F.3d 1030 (8th Cir. 2005).

It is unclear whether petitioner complied with all the substantiation

requirements or complied with all relevant recordkeeping requirements.  The

parties' dispute concerns whether petitioner engaged in his horse-related activities

with the requisite profit objective, and the very little evidence provided in regard

to petitioner's rudimentary style of recordkeeping did not show the adequacy of

petitioner's substantiation or recordkeeping practices with respect to the

requirements of section 7491.  Accordingly, the burden has not shifted to

respondent.

I.  Section 183

Under section 183(a), if an activity is not engaged in for profit, then no

deduction attributable to that activity is allowed except to the extent provided by

section 183(b).  In pertinent part, section 183(b) allows those deductions that

would have been allowable had the activity been engaged in for profit only to the

extent of gross income derived from the activity, reduced by deductions

attributable to the activity that are allowable without regard to whether the activity

was engaged in for profit.

[*20] Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions are allowable under section 162 or under section 212(1) or (2) if the taxpayer is engaged in the activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer need not, however, establish that his or her expectation of profit was reasonable. Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.

The existence of the requisite profit objective is a question of fact that must be decided on the basis of all of the facts and circumstances. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), aff'd without published opinion, 782 F.2d 1027 (3d Cir. 1986); sec. 1.183-2(b), Income Tax Regs. In resolving this factual question, greater weight is given to objective facts than to a taxpayer's statement of intent. See Elliott v. Commissioner, 84 T.C. at 236-237; sec. 1.183-2(a), Income Tax Regs.

The regulations set forth a nonexhaustive list of factors that may be considered in deciding whether a profit objective exists. These factors are: (1) the

**[*21]** manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation.  Sec. 1.183-2(b), Income Tax Regs.  These factors are not exclusive, and no single factor is determinative.  Id.

A.  Manner of Carrying on the Activity

The first factor the Court considers is the manner in which the taxpayer carries on the activity.  The fact that the taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective.  Sec. 1.183-2(b)(1), Income Tax Regs.  Similarly, where an activity is carried on in a manner substantially similar to other profitable activities of the same nature, a profit objective may be indicated.  Id.  A change of operation methods, adoption of new techniques, or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit objective.  Id.  A taxpayer should use some cost accounting

[*22] techniques that, at a minimum, provide the entrepreneur with the information required to make informed business decisions. Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), aff'g T.C. Memo. 1985-523. Without such a basis for decisions affecting the enterprise, the incidence of a profit in any period would be wholly fortuitous, and losses would be expected. Id.

Petitioner demonstrated significant changes in operation, adoption of new techniques, and abandonment of unprofitable methods when he moved his horse racing activity from the Morris Street property to the Mooresville property. He recognized that the Morris Street property was not suitable because the buildings were in disrepair and building a new facility at this location was cost prohibitive because of the city's building codes. The city was imposing a $100-a-day fine and increased his property tax from around $1,000 a year to $17,000. Petitioner chose to mitigate these expenses by liquidating his old facility and moving to a property that would help make him more money.

The larger Mooresville property allowed petitioner to build substantially larger and better new facilities and the increased size also allowed petitioner to reduce his fixed feeding costs by growing his own hay and renting out part of the property. Petitioner rented out 90 acres of the Mooresville property for around $20,000 a year--further reducing his horse racing activity costs. The Mooresville

[*23] property was suitable for producing high-quality horse hay, which he planted and harvested, demonstrating petitioner's willingness to adopt new cost-saving techniques.

Further, while petitioner did not undertake any business studies, he did significantly change his business model when he hired an assistant trainer after moving to the Mooresville property. See Phillips v. Commissioner, T.C. Memo. 1997-128 (explaining a business plan was evidenced by actions instead of a written document). Instead of balancing a schedule between the racetrack and the training facility, petitioner could delegate tasks and potentially increase profitability by hiring a full-time assistant trainer. In his own words, petitioner would "meet himself coming and going", and the employee allowed petitioner to spend more of his time training horses while his assistant coordinated racing activities. Petitioner also earned additional income from trainer's fees when his assistant trained third-party horses. These significant changes in operating methods suggest petitioner engaged in horse racing activities for profit once his new facility was placed in service starting in the 2007 tax year.

Petitioner also treated other aspects of his horse-related activities in a professional manner. For example, petitioner planned to take advantage of a retirement system for horse trainers in Kentucky. According to petitioner, the

[*24] retirement program divided an amount of money between trainers and assistant trainers who are retiring and who ran 11 horse races in Kentucky per year. Petitioner was based in Indiana but raced in other States. Petitioner credibly testified that he had run at least 11 races in Kentucky for several years and that he believed that if he continued his current racing schedule, he would qualify to collect some of the Kentucky trainers' retirement benefits.

Respondent points to petitioner's accounting methods to show he was not carrying on the activities in a businesslike manner. Primarily, respondent suggests petitioner's disorganization and reliance on an accountant is not businesslike. However, the accounting method needs only "provide the entrepreneur with the information * * * require[d] to make informed business decisions." Burger v. Commissioner, 809 F.2d at 359. While rudimentary, petitioner's system of recordkeeping allowed him to make informed business decisions. His daily costs for each horse were consistent, and he had a method of keeping receipts or bank documents to track additional expenses. A publicly available Internet database conveniently tracks the starts, placement, earnings, and other information of each horse petitioner raced. The database also tracks entry fees and awarded purses, allowing racehorse professionals to closely monitor the performance of each horse on line. Petitioner's accounting methods, at a minimum, provided him with

[*25] enough information to make informed business decisions. This factor is neutral for tax years 2005 and 2006. For 2007 and 2008, however, when petitioner made significant changes to his operating procedure and location, this factor favors petitioner.

### B. Expertise of Taxpayer or Advisors

The next factor to consider is the expertise of the taxpayer and his advisers. Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit objective where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs. Petitioner acknowledged that merely buying a horse does not make the owner an expert. Petitioner did, however, have enough business acumen to seek sound advice from horse breeding and racing experts. He noted that he entered the horse racing profession later than many other professionals and wanted to rapidly learn about the business. Petitioner consulted with bloodstock agents and respected trainers on various aspects of the horse racing business. When he had a question about the business, he would call an expert to find an answer. For example, when building a new training facility, petitioner incorporated advice from industry experts into the design of the buildings and improvements.

[*26] Further, petitioner immersed himself in all aspects of the horse racing business, becoming an expert in his own right. Instead of taking a cursory interest in horses, he chose to be intimately involved with, and gain valuable knowledge from, the horse racing business. Petitioner learned to administer medication, choose specific events for each horse, rehabilitate injured horses and assemble racing equipment, and he acquired many other skills usually possessed by an expert in the horse racing business.

Respondent contends that petitioner developed only an "expertise with respect to the actual boarding, breeding, and training of horses * * * [but] developed no expertise in the financial aspects of the horse-related activities." Respondent, however, omitted an important aspect of petitioner's horse-related activities: racing. To enter a horse into a race, the decisionmaker--whether trainer or owner--must have an in-depth understanding of the financial aspects of the proposition. If a superb horse enters into a low-claim claiming race, the horse may be bought cheaply from the owner and the owner will lose money. If an outmatched horse enters a stakes race, the owner will not earn back the entry fee. Petitioner learned about how to enter races and how to pick a horse for a specific race to maximize his potential prize. Thus, to navigate the complex regulations and financial possibilities of horse racing, petitioner was required to gain expertise

[*27] in the financial aspects of his horse-related activities. For example, petitioner learned of ruses that unscrupulous racers would use to maximize profit potential. In one case, petitioner heard of racers affixing raw cuts of meat to a horse's ankles so that the horse would appear to be in poor shape and not be claimed. A racer that is aware of the ruse may claim the horse and profit from the transaction.

Petitioner credibly testified that he spent significant effort and time to match the right horse to the right race. He spent this time matching each horse to a race with the expectation of making a profit. He admitted that it took time to learn this skill but that it was the "secret" to the business. Petitioner's custom-tailored entry strategy shows he was an expert in the financial aspects of his horse-related activities.

Petitioner also displayed his expertise through his participation in trade associations. Much like his progression from member to leader of nightclub associations, petitioner rose through the ranks into leadership roles at two professional horse racing associations. In one organization, petitioner's peers placed enough weight on his expertise to ask him to run for the leadership role. Petitioner did not independently volunteer for the position but was asked to run for it presumably because his peers trusted him with the responsibility.

[*28] Further, petitioner shows that he was an expert in the financial aspects of the horse racing industry through his contributions to the horse racing lobbying effort. An experienced horse racing lobbyist credibly testified that he would discuss the finer points of horse racing with petitioner in connection to the lobbying effort. The legislature eventually passed the slot bill, which would significantly affect the financial aspects of horse racing in Indiana. Petitioner knew the new bill would increase the purse size and wished to contribute to the effort. In other words, petitioner was on the ground floor of improving economic conditions for horse racing in Indiana. Accordingly, this factor weighs in favor of petitioner's profit objective for all the tax years in issue.

    C. Time and Effort Devoted to the Activity

The third factor to consider is the time and effort expended by the taxpayer in carrying on the activity. The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. Sec. 1.183-2(b)(3), Income Tax Regs. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. Id. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack

**[\*29]** of profit objective where the taxpayer employs competent and qualified persons to carry on the activity. <u>Id.</u>

In <u>Barbour v. Commissioner</u>, T.C. Memo. 1976-85, the Court found that full-time participation in an activity tended to show that a taxpayer was engaged in a for-profit activity. Petitioner was working on horse-related activities some portion of every day by at least 2002 and full time by at least 2005. He treated the activities as a full-time profession and worked long hours to train horses. Horse racing is a seasonal activity, and it was sometimes necessary for petitioner to work longer hours when horses were training and racing.

Further, the <u>Barbour</u> case suggests that participation in unpleasurable work associated with an activity tends to show a profit objective. In <u>Barbour</u>, the Court found that enduring cold temperatures and administering medication to ensure the profitability of an animal showed a profit objective. Similar to the taxpayer in that case, petitioner often endured cold winter temperatures to work with his horses. He also performed other unpleasant and burdensome activities such as administering shots and rebuilding fences. In sum, petitioner devoted a significant amount of his personal time and effort to carrying on the activities where the

[*30] activities did not have substantial personal or recreational aspects, and this tends to show a profit objective.[13]

Respondent questions the amount of time actually dedicated to horse-related activities during the tax years in issue. Specifically, respondent points to the fact that petitioner continued to earn income related to his former occupation of running nightclubs. Respondent seems to challenge whether petitioner could have spent the amount of reported time dedicated to horse-related activities and still performed functions deserving remuneration from other sources. Indeed, petitioner did not deny that he was still tangentially involved in the nightclub industry.[14] He credibly testified that he was able to consult on high-level decisions by using his cell phone. He explained that cell phones allowed him to consult with business contacts several times a day but that it did not detract from time dedicated to training horses. Petitioner credibly testified that he could not "stop * * * [his] training of the horses to go over there and sit and talk for hours." Instead, his cell phone allowed him to balance his time between the two activities.

---

[13]As discussed infra, petitioner transitioned from participating in the more recreational aspect to the more businesslike aspect of his operation in tax year 2007 when he moved to the Mooresville property and began spending most of his time at the training facility rather than at the racetrack.

[14]Petitioner retained no financial interests in his nightclub businesses but for his consulting fees and rental payments.

**[*31]** Accordingly, by tax year 2005 petitioner devoted time and effort appropriate to demonstrate a profit objective for all the tax years in issue.

####   D. Expectation That the Assets Used in the Activity Will Appreciate in Value

The fourth factor to consider is the expectation that the assets used in the activity may appreciate in value. The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Sec. 1.183-2(b)(4), Income Tax Regs. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit is derived from current operations, an overall profit will result when appreciation in the value of the assets used in the activity is realized since income from the activity together with the appreciation of the assets will exceed expenses of operation. Id.

Petitioner's horse-related activities include two different types of appreciable assets: first, the horses that petitioner bred and trained; second, the real property and capital improvements associated with his training facility. Respondent does not dispute that petitioner purchased or bred each horse with the expectation the horse would increase in value.

Respondent does, however, contend that petitioner's real property is not an asset used in the activities and that any expectation of appreciation is not a factor

[*32] to be considered in determining whether petitioner was engaged in his horse-related activities for profit. Respondent is correct for the 2005 and 2006 tax years and incorrect for the 2007 and 2008 tax years because petitioner moved his horse-related activities during the 2007 tax year.

Where land is purchased or held primarily with the intent to profit from an increase in its value, and a taxpayer also engages in another activity on the land, the activity and the holding of the land will ordinarily be considered a single activity only if the income derived from the activity exceeds the deductions attributable to that activity which are not directly attributable to the holding of the land. Sec. 1.183-1(d)(1), Income Tax Regs. In other words, when a taxpayer buys land mainly to profit from its appreciation, the potential appreciation of the land is relevant to a section 183 analysis only if the activity generates income in excess of the deductions for the activity. When a taxpayer's primary intent is not to profit from the land, then the appreciation of the land is considered in a section 183 profit analysis. See Perry v. Commissioner, T.C. Memo. 1997-417 (citing Hoyle v. Commissioner, T.C. Memo. 1994-592).

Petitioner's primary intent in purchasing and holding the Morris Street property was to gain from the real estate appreciation. When asked whether he intended to use the Morris Street property for horse-related activities, petitioner

[*33] responded: "No, in my mind the property is going to [be] worth a lot of money * * * I'll just make a little money, pay the taxes, hang on to it until I can sell it." This is a clear indication that his primary purpose was not to train or race horses on the Morris Street property. Further, petitioner's horse-related activities did not reduce the net cost of carrying the Morris Street property. As a result, holding the Morris Street property was an activity separate from petitioner's horse-related activities, and any expectation of appreciation of that real estate does not contribute to a finding that he was engaged in those activities for profit.

In contrast, petitioner specifically purchased and held the Mooresville property to breed and train horses. His primary intent was to build a premier horse training facility, and he purchased property to suit his needs. Petitioner started searching for a new location because problems arose from building a barn on the Morris Street property. He recognized that to be a competitive horse trainer he needed to "build a better mousetrap in the horse business". A major aspect of his improved mousetrap included a better location because the Morris Street property was not ideal for horse training. Petitioner sought a new location and intended to train horses on the land when he purchased the Mooresville property. Further, petitioner followed through and completed a well-furnished horse operation. He improved the land with a significant amount of specialized equipment, and in his

**[*34]** opinion the training facility was unmatched in the State of Indiana. Admittedly, petitioner recognized that the land might appreciate, but capitalizing on appreciation was not his primary intent in purchasing or holding the Mooresville property. Accordingly, the Mooresville property's expected appreciation is relevant to whether petitioner carried on his horse-related activities with the intent to profit under section 183. However, petitioner transferred the headquarters of his horse-related activities to Mooresville in 2007, and thus, tax year 2007 is the first tax year that real estate appreciation expectation weighs in favor of finding for petitioner's profit objective under section 183. For tax years 2005 and 2006 the factor is neutral.

### E. Success in Carrying On Other Activities

The fifth factor to consider is the success of the taxpayer in carrying on other similar or dissimilar activities. The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs. Moreover, diligence, initiative, foresight, and other qualities that generally lead to success in other business activities may help demonstrate profit objective

[*35] of a new venture.  See McNaught v. Commissioner, T.C. Memo. 1999-25;

Daugherty v. Commissioner, T.C. Memo. 1983-188.

Petitioner built a successful nightclub business from very humble

beginnings.  He turned a single unprofitable bar into a network of up to six

different establishments, employing enough individuals to necessitate creating a

staffing company to coordinate shifts.  Later, petitioner started a successful car

dealership and an insulation company.  Moreover, petitioner appears to be a

successful real estate speculator.  Further, petitioner's peers trusted him to serve as

a representative and advocate for two different industries within Indiana,

demonstrating his ability to transfer skills across vastly different trades.  He

worked hard and showed initiative, foresight, and other qualities that led to

success in his other business activities, and he had reason to expect eventual

success in his horse-related activities.  Accordingly, this factor weighs in

petitioner's favor.

F.  History of Income or Losses

The sixth factor to consider is the taxpayer's history of income or losses

with respect to the activity in question.  A series of losses during the initial or

startup stage of an activity may not necessarily be an indication that the activity is

not engaged in for profit.  Sec. 1.183-2(b)(6), Income Tax Regs.  However, where

[*36] losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. Id. A record of substantial losses combined with a remote chance of achieving a profitable operation are important factors bearing on a taxpayer's intent to make a profit. Schlafer v. Commissioner, T.C. Memo. 1990-66.

The startup phase for some horse-related activities can be between 5 and 10 years. See Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). Petitioner started his horse-related activities in 1998, and the years in issue fall within this startup phase. Further, sustaining losses after the expected startup period is not necessarily indicative that a taxpayer is not engaged in horse-related activities for profit where the losses can be explained. See Farris v. Commissioner, T.C. Memo. 1972-165. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, these losses would not be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Some of petitioner's losses can be explained by a series of unfortunate events beyond his control.

[*37] These events include the untimely death of several racing and breeding prospects, an unfortunate quarantine during racing season, a contractor's building a shoddy fence that factored into the accidental death of two stallions,[15] and the need to hire and fire several different trainers.  Accordingly, the startup phase and unforeseen expenses balance the history of large losses, and this factor is neutral for all tax years in issue.

G.  The Amount of Occasional Profits

The seventh factor to consider is the amount of occasional profits, if any, which are earned in the course of conducting the activity.  Profit is generally defined as receipts in excess of costs.  See Portland Golf Club v. Commissioner, 497 U.S. 154, 166 (1990).  The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent.  Sec. 1.183-2(b)(7), Income Tax Regs.  An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made large investment, would not generally be determinative that the

---

[15]Horse breeding and racing is speculative, and the loss of some horses may be foreseen, see Chandler v. Commissioner, T.C. Memo. 2010-92, aff'd, 481 Fed. Appx. 400 (9th Cir. 2012), but petitioner's loss of two stallions was more similar to an involuntary conversion because the deaths were from injuries relating to a dishonest contractor.

**[\*38]** activity is engaged in for profit. Id. However, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. Id. For example, an investor in a wildcat oil well who incurs substantial expenditures is engaging in the activity for profit even though the expectation of a profit is very small. Sec. 1.183-2(a), Income Tax Regs.

Horse racing can be very speculative, and the expectation of profit may be very small. Racing a horse has been compared to investing in a wildcat oil well, where there may be substantial expenditures with little chance of profit. See Dawson v. Commissioner, T.C. Memo. 1996-417; sec. 1.183-2(a), Income Tax Regs. Petitioner had success with his first two horses and expected that success to continue. He knew continuing to race horses was a highly speculative activity, but there was a small possibility of large profits. However, because of his participation in various organizations and his assisting with some lobbying efforts, petitioner knew that prize purses were increasing in Indiana. In other words, the ultimate profit potential would significantly increase. Further, one of petitioner's horses was nominated to run in the Triple Crown Races, showing that his horses have the potential to race at a very high level and possibly earn significant

[*39] profits.[16]  Accordingly, petitioner's expectation of future profits was consistent with the existence of a profit objective for all the tax years in issue.  See Betts v. Commissioner, T.C. Memo. 2010-164.

H.  Financial Status

The eighth factor to consider is the financial status of the taxpayer.  The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.  Substantial income from sources other than the activity, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit, especially if personal or recreational elements are involved.  Id.

Petitioner earned income from sources other than horse-related activities.  The losses claimed in relation to the horse-related activities had the effect of reducing petitioner's taxable income.  Petitioner, however, was not an excessively wealthy individual.  His house was mortgaged and he continued to work long hours at a physically demanding endeavor after resigning from several successful ventures.  Further, petitioner participated less in the personal and recreational

---

[16]According to petitioner, once his horse was nominated, it had a 1 in 144 chance of running the races.

[*40] aspects of the horse-related activities starting in tax year 2007, as discussed infra. Under the strict wording of the regulations, this factor favors respondent for all the tax years in issue.

I. Elements of Personal Pleasure or Recreation

The final factor that should be considered is whether the activity in question involves personal pleasure or recreation. The presence of personal motives in the carrying on of an activity may indicate that the activity is not engaged in for profit, especially where recreational or personal elements are involved. Sec. 1.183-2(b)(9), Income Tax Regs. Further, there is likely no profit objective where a taxpayer combines horse racing with social and recreational activities. Sec. 1.183-2(c), Example (4), Income Tax Regs.

Petitioner was first enticed into the horse racing business through a social gathering at a racetrack, where he was invited to a free dinner and a tour of the facilities. Petitioner met trainers and learned about the business. As a result of the social meeting, petitioner registered for an owner's license and bought two young horses. He asked a trainer using his facilities to show him some training basics and only later applied to become a trainer. From 1998 until 2007 petitioner divided his time between racetracks and the training facility. While there is certainly work involved while at racetracks, there is also a higher level of

[*41] recreation and social activity available at a racetrack. A horse trainer can socialize with other trainers and owners. The concessions and public wagering options available also show that a racetrack is a very social and recreational venue, although there is no evidence that petitioner actually participated in the wagering options. Further, a physical embodiment of a trainer's exertions and skills are on public display while a horse is racing. The owner and trainer of a winning horse may get applauded and get his or her picture taken in a winner's circle.

In contrast, the training facility is a largely private operation void of social or recreational activities. Activities such as grading the track, mucking stalls, baling hay, administering medication, and building fences are all necessary for a successful horse race operation, but these activities are rarely publicly displayed, much less applauded. Similar, a trainer cannot socialize or confer with other racing professionals face to face while at the training facility; if a trainer has a question, he or she must call a specialist in order to solicit advice.

During tax years 2005 and 2006 petitioner attended both the track and training activities of his operation. He was able to train horses at his facility, but he was also able to accept the accolades of a successful race. In other words, petitioner participated equally in the social and business aspects of horse racing. In the 2007 tax year, however, petitioner hired an assistant trainer to take over the

[*42] more socially oriented track activities. In doing so, petitioner actively chose to undertake the less glamorous and less recreational activities of his operation. This is indicative that before tax year 2007 petitioner enjoyed some recreational aspects of horse racing, but starting in 2007 he became more interested in the business aspects of the activity.

The Mooresville property was not a recreational facility or a retirement property for petitioner. Petitioner did not build a new house on the Mooresville property, and in fact the new facility was significantly farther from petitioner's home than the Morris Street property. Petitioner's commute to the Mooresville property was about 20 miles a day longer than his commute to the Morris Street property. Petitioner did not purchase the property to have a place to enjoy the golden years of his retirement but instead purchased the property to run a business. Accordingly, the elements of personal pleasure or recreation weigh in respondent's favor for the 2005 and 2006 tax years and in petitioner's favor for tax years 2007 and 2008.

An activity that was previously carried on without a profit objective does not preclude a finding that it has become a trade or business. See Demler v. Commissioner, T.C. Memo. 1966-117. A taxpayer may start an activity without a profit objective and later develop the desire and objective to earn a profit from the

[*43] undertaking.  A taxpayer should not be denied the opportunity to deduct expenses from his or her business merely because the profit objective was not evident from the outset of the activity.

Petitioner started his horse-related activities without a profit objective but later turned his social and recreational activity into a serious business venture. Petitioner's objective may have been gradually changing from the outset of his horse-related activities, but beginning operations at the Mooresville property is a clear indication that his motivation had fully turned to seeking a profit.  In 2006 petitioner--a successful businessman--was given an opportunity to exit the horse training and racing business and pursue other ventures.  While petitioner acquired the land for his horse-related activities in 2006, he could have left it unimproved and stopped his horse activities.  Instead, he chose to reinvest in the activities and open a premier training facility in 2007.  Thus, petitioner's profit objective was first shown in 2007 when he began operating his horse-related activities at the Mooresville property.

Further, the Indiana slot bill was introduced and passed in the spring of 2007.  Petitioner was on the ground floor of the lobbying efforts to pass the legislation and was in a position to recognize the increased profit potential.  He

**[*44]** chose to build a custom training facility to take advantage of the new racing opportunities that the 2007 bill created.

On the basis of the record and considering the nine factors discussed above, the Court finds that petitioner did not engage in horse-related activities for profit during the 2005 and 2006 tax years. However, petitioner demonstrated a profit objective beginning in tax year 2007 when he significantly changed his operation, opened a new facility on real estate specifically purchased for horse-related activities, and transitioned out of the recreational aspect of horse racing. Accordingly, petitioner demonstrated the requisite profit objective under section 183 to deduct business expenses for tax years 2007 and 2008 but not for tax year 2005 or 2006.

## II. Section 6662(a) Penalty

Section 6662(a) and (b)(1) and (2) imposes an accuracy-related penalty equal to 20% of the portion of the underpayment attributable to any substantial understatement of income tax or to negligence or disregard of rules or regulations. Under section 7491(c), the Commissioner has the burden of production to show that the imposition of a penalty under section 6662(a) is appropriate. Respondent has met this burden by presenting evidence that petitioner's underpayments were

[*45] attributable to substantial understatements of income tax for tax years 2005 and 2006.

With exceptions not here relevant, a taxpayer may avoid a section 6662(a) accuracy-related penalty with respect to any portion of an underpayment by showing that he acted with reasonable cause and in good faith with respect to that portion. Sec. 6664(c)(1). Reasonable cause requires that the taxpayer exercise "ordinary business care and prudence" as to the disputed item. United States v. Boyle, 469 U.S. 241, 246 (1985). The term "good faith" has no precise definition but means, among other things, (1) an honest belief and (2) the intent to perform all lawful obligations. E.g., United States v. Hirschfeld, 964 F.2d 318, 322 (4th Cir. 1992). Those determinations are made on a case-by-case basis, taking into account all pertinent facts and circumstances, including the taxpayer's knowledge and experience. Sec. 1.6664-4(b)(1), Income Tax Regs. "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id. The most important factor is the taxpayer's efforts to assess the proper tax liability. Id.

The duty of filing accurate returns generally cannot be avoided by placing the responsibility on an employee or tax return preparer. See Metra Chem Corp. v.

**[*46]** <u>Commissioner</u>, 88 T.C. 654, 662 (1987); <u>Slawek v. Commissioner</u>, T.C. Memo. 1991-338 (finding no reasonable cause defense where taxpayers blamed their employees and accountants for erroneous returns), <u>aff'd without published opinion</u>, 972 F.2d 1332 (3d Cir. 1992). A taxpayer, however, may demonstrate reasonable cause through good-faith reliance on the advice of an independent professional, such as a tax adviser, a lawyer, or an accountant, as to an item's tax treatment. <u>Boyle</u>, 469 U.S. at 251; <u>Canal Corp. & Subs. v. Commissioner</u>, 135 T.C. 199, 218 (2010). To prevail, the taxpayer must show that he: (1) selected a competent adviser with sufficient expertise to justify reliance, (2) supplied the adviser with necessary and accurate information, and (3) actually relied in good faith on the adviser's judgment. <u>106 Ltd. v. Commissioner</u>, 136 T.C. 67, 77 (2011) (citing <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002)), <u>aff'd</u>, 684 F.3d 84 (D.C. Cir. 2012).

Petitioner hired a CPA for his auditing and tax requirements. Petitioner had not been satisfied with the work performed by several accountants before he hired his current CPA, who he met through a mutual acquaintance, to handle the tax aspects of his nightclub businesses. The CPA had experience in the nightclub industry, and petitioner recognized that a CPA might have more skills than a non-CPA accountant. Petitioner continued to employ this CPA for over 20 years.

**[*47]** Petitioner's returns were audited twice before the tax years in issue, and both times he fared well as a result of his CPA's work. Further, as discussed above, petitioner maintained a rudimentary recordkeeping system but did turn over the necessary documents to his CPA in the form of receipts, canceled checks, and bank statements for tax years 2005, 2006, 2007, and 2008. Last, petitioner credibly testified that he relied on his CPA and his attorney for business and tax advice. Accordingly, petitioner demonstrated reasonable cause through good faith for tax years 2005 and 2006. There is no section 6662 penalty with respect to the section 183 adjustments for tax year 2007 or 2008 because there is no deficiency.

## III. Section 6651(a)(1) Addition to Tax

Failure to file a tax return on the date prescribed leads to a mandatory addition to tax unless the taxpayer shows that such failure was due to a reasonable cause and not due to willful neglect. Sec. 6651(a)(1). For each month the return is late, an addition to tax equal to 5% of the amount of tax required to be shown on the return shall be assessed, not exceeding 25% in the aggregate. Id. The amount of tax required to be shown on the return shall be reduced by the amount of any part of the tax which is paid on or before the payment due date. Sec. 6651(b)(1). Under section 7491(c), the Commissioner has the burden of production to show that the imposition of an addition to tax under section 6651(a)(1) is appropriate.

**[*48]** Petitioner conceded that respondent met his burden by presenting evidence that petitioner failed to timely file his 2007 Federal income tax return.

Petitioner's position, based on section 301.6661-1(c), Proced. & Admin. Regs., is that a reasonable cause outside his control caused his delayed filing. Petitioner contends that he had reasonable cause to file his return late because some of his records were burned in a fireplace by a former girlfriend. Petitioner cites a case where a taxpayer was not held liable for a section 6651(a)(1) addition to tax because a hurricane destroyed critical tax documents. The wrath of a former girlfriend may be a formidable force, but it is not analogous to a hurricane-like natural disaster, and it does not constitute a reasonable cause outside petitioner's control. Further, petitioner did not present any evidence showing the records were actually destroyed or document any attempts to find the lost information.

Petitioner also suggests that the Commissioner's audits of prior-year returns was a reasonable cause for his delay. He contends that he knew the 2007 tax return would likely be audited, and he spent extra time to make sure the return was correct. Preoccupation with an audit, however, does not constitute a reasonable cause for failing to timely file a Federal tax return. United States, IRS v. Craddock (In re Craddock), 149 F.3d 1249, 1255 (10th Cir. 1998) (citing Morgan v. Commissioner, 807 F.2d 81, 83 (6th Cir. 1986), aff'g T.C. Memo. 1984-384).

**[*49]** Accordingly, petitioner is liable for an addition to tax for the 2007 tax year under section 6651(a)(1).

We have considered the remaining arguments made by the parties and, to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.